*147 Justice Alito
delivered the opinion of the Court.
The Fair Labor Standards Act (FLSA) imposes minimum wage and maximum hours requirements on employers, see 52 Stat. 1062-1063, as amended, 29 U. S. C. §§206-207 (2006 ed. and Supp. IV), but those requirements do not apply to workers employed “in the capacity of outside salesman,” § 213(a)(1). This case requires us to decide whether the term “outside salesman,” as defined by Department of Labor (DOL or Department) regulations, encompasses pharmaceutical sales representatives whose primary duty is to obtain nonbinding commitments from physicians to prescribe their employer’s prescription drugs in appropriate cases. We conclude that these employees qualify as “outside salesm[e]n.”
I
A
Congress enacted the FLSA in 1938 with the goal of “pro-teet[ing] all covered workers from substandard wages and oppressive working hours.” Barrentine v. Arkansas-Best Freight System, Inc., 450 U. S. 728, 739 (1981); see also 29 U. S. C. § 202(a). Among other requirements, the FLSA obligates employers to compensate employees for hours in excess of 40 per week at a rate of 1½ times the employees’ regular wages. See § 207(a). The overtime compensation requirement, however, does not apply with respect to all employees. See § 213. As relevant here, the statute exempts workers “employed ... in the capacity of outside salesman.” § 213(a)(1).[1]
Congress did not define the term “outside salesman,” but it delegated authority to the DOL to issue regulations “from time to time” to “defin[e] and delimi[t]” the term. Ibid. The DOL promulgated such regulations in 1938, 1940, and 1949. In 2004, following notice-and-comment procedures, *148 the DOL reissued the regulations with minor amendments. See 69 Fed. Reg. 22122 (2004). The current regulations are nearly identical in substance to the regulations issued in the years immediately following the FLSA’s enactment. See 29 CFR §§ 541.500-541.504 (2011).
Three of the DOL’s regulations are directly relevant to this case: §§ 541.500, 541.501, and 541.503. We refer to these three regulations as the “general regulation,” the “sales regulation,” and the “promotion-work regulation,” respectively.
The general regulation sets out the definition of the statutory term “employee employed in the capacity of outside salesman.” It defines the term to mean “any employee . . . [w]hose primary duty is ... making sales within the meaning of [29 U. S. C. § 203(k)]”[2] and “[w]ho is customarily and regularly engaged away from the employer’s place or places of business in performing such primary duty.”[3] §§ 541.500(a) (1)-(2). The referenced statutory provision, 29 U. S. C. § 203(k), states that “‘[s]ale’ or ‘sell’ includes any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition.” Thus, under the general regulation, an outside salesman is any employee whose primary duty is making any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition.
The sales regulation restates the statutory definition of sale discussed above and clarifies that “[s]ales within the meaning of [29 U. S. C. § 203(k)] include the transfer of title to tangible property, and in certain cases, of tangible *149 and valuable evidences of intangible property.” 29 CFR § 541.501(b).
Finally, the promotion-work regulation identifies “[pjromotion work” as “one type of activity often performed by persons who make sales, which may or may not be exempt outside sales work, depending upon the circumstances under which it is performed.” § 541.503(a). Promotion work that is “performed incidental to and in conjunction with an employee’s own outside sales or solicitations is exempt work,” whereas promotion work that is “incidental to sales made, or to be made, by someone else is not exempt outside sales work.” Ibid.
Additional guidance concerning the scope of the outside salesman exemption can be gleaned from reports issued in connection with the DOL’s promulgation of regulations in 1940 and 1949, and from the preamble to the 2004 regulations. See DOL, Wage and Hour Division, Report and Recommendations of the Presiding Officer at Hearings Preliminary to Redefinition (1940) (hereinafter 1940 Report); DOL, Wage and Hour and Public Contracts Divs., Report and Recommendations on Proposed Revisions of Regulations, Part 541 (1949) (hereinafter 1949 Report); 69 Fed. Reg. 22122-22163 (hereinafter Preamble). Although the DOL has rejected proposals to eliminate or dilute the requirement that outside salesmen make their own sales, the Department has stressed that this requirement is met whenever an employee “in some sense make[s] a sale.” 1940 Report 46; see also Preamble 22162 (reiterating that the exemption applies only to an employee who, “in some sense, has made sales”). And the DOL has made it clear that “[ejxempt status should not depend” on technicalities, such as “whether it is the sales employee or the customer who types the order into a computer system and hits the return button,” id., at 22163, or whether “the order is filled by [a] jobber rather than directly by [the employee’s] own employer,” 1949 Report 83.
*150 B
Respondent SmithKline Beecham Corporation is in the business of developing, manufacturing, and selling prescription drugs. The prescription drug industry is subject to extensive federal regulation, including the now-familiar requirement that prescription drugs be dispensed only upon a physician’s prescription.[4] In light of this requirement, pharmaceutical companies have long focused their direct marketing efforts not on the retail pharmacies that dispense prescription drugs but rather on the medical practitioners who possess the authority to prescribe the drugs in the first place. Pharmaceutical companies promote their prescription drugs to physicians through a process called “detailing,” whereby employees known as “detailers” or “pharmaceutical sales representatives” provide information to physicians about the company’s products in hopes of persuading them to write prescriptions for the products in appropriate cases. See Sorrell v. IMS Health Inc., 564 U. S. 552, 558-559 (2011) (describing the process of “detailing”). The position of “de-tailer” has existed in the pharmaceutical industry in substantially its current form since at least the 1950’s, and in recent years the industry has employed more than 90,000 detailers nationwide. See 635 P. 3d 383, 387, and n. 5, 396 (CA9 2011).
Respondent hired petitioners Michael Christopher and Frank Buchanan as pharmaceutical sales representatives in *151 2003. During the roughly four years when petitioners were employed in that capacity,[5] they were responsible for calling on physicians in an assigned sales territory to discuss the features, benefits, and risks of an assigned portfolio of respondent’s prescription drfigs. Petitioners’ primary objective was to obtain a nonbinding commitment[6] from the physician to prescribe those drugs in appropriate cases, and the training that petitioners received underscored the importance of that objective.
Petitioners spent about 40 hours each week in the field calling on physicians. These visits occurred during normal business hours, from about 8:30 a.m. to 5 p.m. Outside of normal business hours, petitioners spent an additional 10 to 20 hours each week attending events, reviewing product information, returning phone calls, responding to e-mails, and performing other miscellaneous tasks. Petitioners were not required to punch a clock or report their hours, and they were subject to only minimal supervision.
Petitioners were well compensated for their efforts. On average, Christopher’s annual gross pay was just over $72,000, and Buchanan’s was just over $76,000.[7] Petitioners’ gross pay included both a base salary and incentive pay. The amount of petitioners’ incentive pay was based on the sales volume or market share of their assigned drugs in their assigned sales territories,[8] and this amount was uncapped. Christopher’s incentive pay exceeded 30 percent of his gross pay during each of his years of employment; Buchanan’s ex *152 ceeded 25 percent. It is undisputed that respondent did not pay petitioners time-and-a-half wages when they worked in excess of 40 hours per week.
C
Petitioners brought this action in the United States District Court for the District of Arizona under 29 U. S. C. § 216(b). Petitioners alleged that respondent violated the FLSA by failing to compensate them for overtime, and they sought both backpay and liquidated damages as relief. Respondent moved for summary judgment, arguing that petitioners were “employed ... in the capacity of outside salesman,” § 213(a)(1), and therefore were exempt from the FLSA’s overtime compensation requirement.[9] The District Court agreed and granted summary judgment to respondent. See App. to Pet. for Cert. 37a-47a.
After the District Court issued its order, petitioners filed a motion to alter or amend the judgment, contending that the District Court had erred in failing to accord controlling deference to the DOL’s interpretation of the pertinent regulations. That interpretation had been announced in an uninvited amicus brief filed by the DOL in a similar action then pending in the Second Circuit. See Brief for Secretary of Labor as Amicus Curiae in In re Novartis Wage and Hour Litigation, No. 09-0437 (hereinafter Secretary’s Novartis Brief). The District Court rejected this argument and denied the motion. See App. to Pet. for Cert. 48a-52a.
The Court of Appeals for the Ninth Circuit affirmed. See 635 F. 3d 383. The Court of Appeals agreed that the DOL’s interpretation[10] was not entitled to controlling deference. *153 See id., at 393-395. It held that, because the commitment that petitioners obtained from physicians was the maximum possible under the rules applicable to the pharmaceutical industry, petitioners made sales within the meaning of the regulations. See id., at 395-397. The court found it significant, moreover, that the DOL had previously interpreted the regulations as requiring only that an employee “‘in some sense’ ” make a sale, see id., at 395-396 (emphasis deleted), and had “acquiesce[d] in the sales practices of the drug industry for over seventy years,” id., at 399.
The Ninth Circuit’s decision conflicts with the Second Circuit’s decision in In re Novartis Wage and Hour Litigation, 611 F. 3d 141, 153-155 (2010) (holding that the DOL’s interpretation is entitled to controlling deference). We granted certiorari to resolve this split, 565 U. S. 1057 (2011), and we now affirm the judgment of the Ninth Circuit.
H-l \-H
We must determine whether pharmaceutical detailers are outside salesmen as the DOL has defined that term in its regulations. The parties agree that the regulations themselves were validly promulgated and are therefore entitled to deference under Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc., 467 U. S. 837 (1984). But the parties disagree sharply about whether the DOL’s interpretation of the regulations is owed deference under Auer v. Robbins, 519 U. S. 452 (1997). It is to that question that we now turn.
A
The DOL first announced its view that pharmaceutical de-tailers are not exempt outside salesmen in an amicus brief filed in the Second Circuit in 2009, and the Department has subsequently filed similar amicus briefs in other cases, including the case now before us.[11] While the DOL’s ultimate *154 conclusion that detailers are not exempt has remained unchanged since 2009, the same cannot be said of its reasoning. In both the Second Circuit and the Ninth Circuit, the DOL took the view that “a ‘sale’ for the purposes of the outside sales exemption requires a consummated transaction directly involving the employee for whom the exemption is sought.” Secretary’s Novartis Brief 11; see also Brief for Secretary of Labor as Amicus Curiae in No. 10-15257 (CA9), p. 12. Perhaps because of the nebulous nature of this “consummated transaction” test,[12] the Department changed course after we granted certiorari in this case. The Department now takes the position that “[a]n employee does not make a ‘sale’ for purposes of the ‘outside salesman’ exemption unless he actually transfers title to the property at issue.” Brief for United States as Amicus Curiae 12-13 (hereinafter U. S. Brief).[13] Petitioners and the DOL assert that this new interpretation of the regulations is entitled to controlling *155 deference. See Brief for Petitioners 31-42; U. S. Brief 30-34.[14]
Although Auer ordinarily calls for deference to an agency’s interpretation of its own ambiguous regulation, even when that interpretation is advanced in a legal brief, see Chase Bank USA, N. A. v. McCoy, 562 U. S. 195, 210 (2011); Auer, 519 U. S., at 461-462, this general rule does not apply in all cases. Deference is undoubtedly inappropriate, for example, when the agency’s interpretation is “ ‘ “plainly erroneous or inconsistent with the regulation.”’” Id., at 461 (quoting Robertson v. Methow Valley Citizens Council, 490 U. S. 332, 359 (1989)). And deference is likewise unwarranted when there is reason to suspect that the agency’s interpretation “does not reflect the agency’s fair and considered judgment on the matter in question.” Auer, supra, at 462; see also, e. g., Chase Bank, supra, at 213. This might occur when the agency’s interpretation conflicts with a prior interpretation, see, e. g., Thomas Jefferson Univ. v. Shalala, 512 U. S. 504, 515 (1994), or when it appears that the interpretation is nothing more than a “convenient litigating position,” Bowen v. Georgetown Univ. Hospital, 488 U. S. 204, 213 (1988), or a “ ‘post hoc rationalization]’ advanced by an agency seeking to defend past agency action against attack,” Auer, supra, at 462 (quoting Bowen, supra, at 212; alteration in original).
In this case, there are strong reasons for withholding the deference that Auer generally requires. Petitioners invoke the DOL’s interpretation of ambiguous regulations to impose potentially massive liability on respondent for conduct that *156 occurred well before that interpretation was announced. To defer to the agency’s interpretation in this circumstance would seriously undermine the principle that agencies should provide regulated parties “fair warning of the conduct [a regulation] prohibits or requires.” Gates & Fox Co. v. Occupational Safety and Health Review Comm’n, 790 F. 2d 154, 156 (CADC 1986) (Scalia, J.).[15] Indeed, it would result in precisely the kind of “unfair surprise” against which our cases have long warned. See Long Island Care at Home, Ltd. v. Coke, 551 U. S. 158, 170-171 (2007) (deferring to new interpretation that “create[d] no unfair surprise” because agency had proceeded through notice-and-comment rule-making); Martin v. Occupational Safety and Health Review Comm’n, 499 U. S. 144, 158 (1991) (identifying “adequacy of notice to regulated parties” as one factor relevant to the reasonableness of the agency’s interpretation); NLRB v. Bell Aerospace Co., 416 U. S. 267, 295 (1974) (suggesting that an *157 agency should not change an interpretation in an adjudicative proceeding where doing so would impose “new liability .. . on individuals for past actions which were taken in good-faith reliance on [agency] pronouncements” or in a ease involving “fines or damages”).
This case well illustrates the point. Until 2009, the pharmaceutical industry had little reason to suspect that its longstanding practice of treating detailers as exempt outside salesmen transgressed the FLSA. The statute and regulations certainly do not provide clear notice of this. The general regulation adopts the broad statutory definition of “sale,” and that definition, in turn, employs the broad catchall phrase “other disposition.” See 29 CFR § 541.500(a)(1). This catchall phrase could reasonably be construed to encompass a nonbinding commitment from a physician to prescribe a particular drug, and nothing in the statutory or regulatory text or the DOL’s prior guidance plainly requires a contrary reading. See Preamble 22162 (explaining that an employee must “in some sense” make a sale); 1940 Report 46 (same).
Even more important, despite the industry’s decades-long practice of classifying pharmaceutical detailers as exempt employees, the DOL never initiated any enforcement actions with respect to detailers or otherwise suggested that it thought the industry was acting unlawfully.[16] We acknowledge that an agency’s enforcement decisions are informed by a host of factors, some bearing no relation to the agency’s views regarding whether a violation has occurred. See, e. g., Heckler v. Chaney, 470 U. S. 821, 831 (1985) (noting that *158 “an agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise”). But where, as here, an agency’s announcement of its interpretation is preceded by a very lengthy period of conspicuous inaction, the potential for unfair surprise is acute. As the Seventh Circuit has noted, while it may be “possible for an entire industry to be in violation of the [FLSA] for a long time without the Labor Department noticing,” the “more plausible hypothesis” is that the Department did not think the industry’s practice was unlawful. Dong Yi v. Sterling Collision Centers, Inc., 480 F. 3d 505, 510-511 (2007). There are now approximately 90,000 pharmaceutical sales representatives; the nature of their work has not materially changed for decades and is well known; these employees are well paid; and like quintessential outside salesmen, they do not punch a clock and often work more than 40 hours per week. Other than acquiescence, no explanation for the DOL’s inaction is plausible.
Our practice of deferring to an agency’s interpretation of its own ambiguous regulations undoubtedly has important advantages,[17] but this practice also creates a risk that agencies will promulgate vague and open-ended regulations that they can later interpret as they see fit, thereby “frustrating] the notice and predictability purposes of rulemaking.” Talk America, Inc. v. Michigan Bell Telephone Co., 564 U. S. 50, 69 (2011) (Scalia, J., concurring); see also Stephenson & Pogoriler, Seminole Rock’s Domain, 79 Geo. Wash. L. Rev. 1449, 1461-1462 (2011); Manning, Constitutional Structure and Judicial Deference to Agency Interpretations of Agency Rules, 96 Colum. L. Rev. 612, 655-668 (1996). It is one thing *159 to expect regulated parties to conform their conduct to an agency’s interpretations once the agency announces them; it is quite another to require regulated parties to divine the agency’s interpretations in advance or else be held liable when the agency announces its interpretations for the first time in an enforcement proceeding and demands deference.
Accordingly, whatever the general merits of Auer deference, it is unwarranted here. We instead accord the Department’s interpretation a measure of deference proportional to the “ ‘thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade.’ ” United States v. Mead Corp., 533 U. S. 218, 228 (2001) (quoting Skidmore v. Swift & Co., 323 U. S. 134, 140 (1944)).
B
We find the DOL’s interpretation of its regulations quite unpersuasive. The interpretation to which we are now asked to defer—that a sale demands a transfer of title— plainly lacks the hallmarks of thorough consideration. Because the DOL first announced its view that pharmaceutical sales representatives do not qualify as outside salesmen in a series of amicus briefs, there was no opportunity for public comment, and the interpretation that initially emerged from the Department’s internal decisionmaking process proved to be untenable. After arguing successfully in the Second Circuit and then unsucessfully in the Ninth Circuit that a sale for present purposes simply requires a “consummated transaction,” the DOL advanced a different interpretation in this Court. Here, the DOL’s brief states unequivocally that “[a]n employee does not make a ‘sale’ for purposes of the ‘outside salesman’ exemption unless he actually transfers title to the property at issue.” U. S. Brief 12-13.
This new interpretation is flatly inconsistent with the FLSA, which defines “sale” to mean, inter alia, a “consignment for sale.” A “consignment for sale” does not involve *160 the transfer of title. See, e. g., Sturm v. Boker, 150 U. S. 312, 330 (1893) (“The agency to sell and return the proceeds, or the specific goods if not sold ... does not involve a change of title”); Hawkland, Consignment Selling Under the Uniform Commercial Code, 67 Com. L. J. 146, 147 (1962) (explaining that “‘[a] consignment of goods for sale does not pass the title at any time, nor does it contemplate that it should be passed’ ” (quoting Rio Grande Oil Co. v. Miller Rubber Co. of N. Y., 31 Ariz. 84, 87, 250 P. 564, 565 (1926))).
The DOL cannot salvage its interpretation by arguing that a “consignment for sale” may eventually result in the transfer of title (from the consignor to the ultimate purchaser if the consignee in fact sells the good). Much the same may be said about a physician’s nonbinding commitment to prescribe a particular product in an appropriate case. In that situation, too, agreement may eventually result in the transfer of title (from the manufacturer to a pharmacy and ultimately to the patient for whom the drug is prescribed).
In support of its new interpretation, the DOL relies heavily on its sales regulation, which states in part that “[s]ales [for present purposes] include the transfer of title to tangible property,” 29 CFR § 541.501(b) (emphasis added). This regulation, however, provides little support for the DOL’s position. The DOL reads the sales regulation to mean that a “sale” necessarily includes the transfer of title, but that is not what the regulation says. And it seems clear that that is not what the regulation means. The sentence just subsequent to the one on which the DOL relies, echoing the terms of the FLSA, makes clear that a “consignment for sale” qualifies as a sale. Since a consignment for sale does not involve a transfer of title, it is apparent that the sales regulation does not mean that a sale must include a transfer of title, only that transactions involving a transfer of title are included within the term “sale.”
Petitioners invite us to look past the DOL’s “determination that a sale must involve the transfer of title” and instead defer to the Department’s “explanation that obtaining a non *161 binding commitment to prescribe a drug constitutes promotion, and not sales.” Reply Brief 17. The problem with the DOL’s interpretation of the promotion-work regulation, however, is that it depends almost entirely on the DOL’s flawed transfer-of-title interpretation. The promotion-work regulation does not distinguish between promotion work and sales; rather, it distinguishes between exempt promotion work and nonexempt promotion work. Since promotion work that is performed incidental to an employee’s own sales is exempt, the DOL’s conclusion that pharmaceutical detail-ers perform only nonexempt promotion work is only as strong as the reasoning underlying its conclusion that those employees do not make sales. For the reasons already discussed, we find this reasoning wholly unpersuasive.
In light of our conclusion that the DOL’s interpretation is neither entitled to Auer deference nor persuasive in its own right, we must employ traditional tools of interpretation to determine whether petitioners are exempt outside salesmen.
C
1
We begin with the text of .the FLSA. Although the provision that establishes the overtime salesman exemption does not furnish a clear answer to the question before us, it provides at least one interpretive clue: It exempts anyone “employed . . . in the capacity of [an] outside salesman.” 29 U. S. C. § 213(a)(1) (emphasis added). “Capacity,” used in this sense, means “[ojutward condition or circumstances; relation; character; position.” Webster’s New International Dictionary 396 (2d ed. 1934); see also 2 Oxford English Dictionary 89 (def. 9) (1933) (“[position, condition, character, relation”). The statute’s emphasis on the “capacity” of the employee counsels in favor of a functional, rather than a formal, inquiry, one that views an employee’s responsibilities in the context of the particular industry in which the employee works.
*162 The DOL’s regulations provide additional guidance. The general regulation defines an outside salesman as an employee whose primary duty is “making sales,” and it adopts the statutory definition of “sale.” 29 CFR § 541.500(a)(1)(i). This definition contains at least three important textual clues. First, the definition is introduced with the verb “includes” instead of “means.” This word choice is significant because it makes clear that the examples enumerated in the text are intended to be illustrative, not exhaustive. See Burgess v. United States, 553 U. S. 124, 131, n. 3 (2008) (explaining that “[a] term whose statutory definition declares what it ‘includes’ is more susceptible to extension of meaning . . . than where . . . the definition declares what a term ‘means’” (alteration in original; some internal quotation marks omitted)). Indeed, Congress used the narrower word “means” in other provisions of the FLSA when it wanted to cabin a definition to a specific list of enumerated items. See, e. g., 29 U. S. C. § 203(a) (“ ‘Person’ means an individual, partnership, association, corporation, business trust, legal representative, or any organized group of persons” (emphasis added)).
Second, the list of transactions included in the statutory definition of sale is modified by the word “any.” We have recognized that the modifier “any” can mean “different things depending upon the setting,” Nixon v. Missouri Municipal League, 541 U. S. 125, 132 (2004), but in the context of 29 U. S. C. § 203(k), it is best read to mean “ ‘one or some indiscriminately of whatever kind,’ ” United States v. Gonzales, 520 U. S. 1, 5 (1997) (quoting Webster’s Third 97 (1976)). That is so because Congress defined “sale” to include both the unmodified word “sale” and transactions that might not be considered sales in a technical sense, including exchanges and consignments for sale.[18]
*163 Third, Congress also included a broad catchall phrase: “other disposition.” Neither the statute nor the regulations define “disposition,” but dictionary definitions of the term range from “relinquishment or alienation” to “arrangement.” See Webster’s New International Dictionary 644 (def. 1(b)) (1927) (“[t]he getting rid, or making over, of anything; relinquishment or alienation”); ibid. (def. 1(a)) (“[t]he ordering, regulating, or administering of anything”); 3 Oxford English Dictionary, at 493 (def. 4) (“[t]he action of disposing of, putting away, getting rid of, making over, etc.”); ibid. (def. 1) (“[t]he action of setting in order, or condition of being set in order; arrangement, order”). We agree with the DOL that the rule of ejusdem generis should guide our interpretation of the catchall phrase, since it follows a list of specific items.[19] But the limit the DOL posits, one that would confine the phrase to dispositions involving “eontract[s] for the exchange of goods or services in return for value,” see U. S. Brief 20, is much too narrow, as is petitioners’ view that a sale requires a “firm agreement” or “firm commitment” to buy, see Tr. of Oral Arg. 64, 66. These interpretations would defeat Congress’ intent to define “sale” in abroad manner and render the general statutory language meaningless. See United States v. Alpers, 338 U. S. 680, 682 (1950) (instructing that rule of ejusdem gene-ris cannot be employed to “obscure and defeat the intent and purpose of Congress” or “render general words meaningless”). Indeed, we are hard pressed to think of any contract for the exchange of goods or services in return for value or any firm agreement to buy that would not also fall within one of the specifically enumerated categories.[20]
*164 The specific list of transactions that precedes the phrase “other disposition” seems to us to represent an attempt to accommodate industry-by-industry variations in methods of selling commodities. Consequently, we think that the catchall phrase “other disposition” is most reasonably interpreted as including those arrangements that are tantamount, in a particular industry, to a paradigmatic sale of a commodity.
Nothing in the remaining regulations requires a narrower construction.[21] As discussed above, the sales regulation instructs that sales within the meaning of 29 U. S. C. § 203(k) “include the transfer of title to tangible property,” 29 CFR § 541.501(b) (emphasis added), but this regulation in no way limits the broad statutory definition of “sale.” And although the promotion-work regulation distinguishes between promotion work that is incidental to an employee’s own sales and work that is incidental to sales made by someone else, see § 541.503(a), this distinction tells us nothing about the meaning of “sale.” [22]
*165 2
Given our interpretation of “other disposition,” it follows that petitioners made sales for purposes of the FLSA and therefore are exempt outside salesmen within the meaning of the DOL’s regulations. Obtaining a nonbinding commitment from a physician to prescribe one of respondent’s drugs is the most that petitioners were able to do to ensure the eventual disposition of the products that respondent sells.[23] This kind of arrangement, in the unique regulatory environment within which pharmaceutical companies must operate, comfortably falls within the catchall category of “other disposition.”
That petitioners bear all of the external indicia of salesmen provides further support for our conclusion. Petitioners were hired for their sales experience. They were trained to *166 close each sales call by obtaining the maximum commitment possible from the physician. They worked away from the office, with minimal supervision, and they were rewarded for their efforts with incentive compensation. It would be anomalous to require respondent to compensate petitioners for overtime, while at the same time exempting employees who function identically to petitioners in every respect except that they sell physician-administered drugs, such as vaccines and other injectable pharmaceuticals, that are ordered by the physician directly rather than purchased by the end user at a pharmacy with a prescription from the physician.
Our holding also comports with the apparent purpose of the FLSA’s exemption for outside salesmen. The exemption is premised on the belief that exempt employees “typically earned salaries well above the minimum wage” and enjoyed other benefits that “se[t] them apart from the nonexempt workers entitled to overtime pay.” Preamble 22124. It was also thought that exempt employees performed a kind of work that “was difficult to standardize to any time frame and could not be easily spread to other workers after 40 hours in a week, making compliance with the overtime provisions difficult and generally precluding the potential job expansion intended by the FLSA’s time-and-a-half overtime premium.” Ibid. Petitioners—each of whom earned an average of more than $70,000 per year and spent between 10 and 20 hours outside normal business hours each week performing work related to his assigned portfolio of drugs in his assigned sales territory—are hardly the kind of employees that the FLSA was intended to protect. And it would be challenging, to say the least, for pharmaceutical companies to compensate detailers for overtime going forward without significantly changing the nature of that position. See, e. g., Brief for Pharmaceutical Research and Manufacturers of America (PhRMA) as Amicus Curiae 14-20 (explaining that “key aspects of [detailers’] jobs as they are *167 currently structured are fundamentally incompatible with treating [detailers] as hourly employees”).
3
The remaining arguments advanced by petitioners and the dissent are unavailing. Petitioners contend that detailers are more naturally classified as nonexempt promotional employees who merely stimulate sales made by others than as exempt outside salesmen. They point out that respondent’s prescription drugs are not actually sold until distributors and retail pharmacies order the drugs from other employees. See Reply Brief 7. Those employees,[24] they reason, are the true salesmen in the industry, not detailers. This formalistic argument is inconsistent with the realistic approach that the outside salesman exemption is meant to reflect.
Petitioners’ theory seems to be that an employee is properly classified as a nonexempt promotional employee whenever there is another employee who actually makes the sale in a technical sense. But, taken to its extreme, petitioners’ theory would require that we treat as a nonexempt promotional employee a manufacturer’s representative who takes an order from a retailer but then transfers the order to a jobber’s employee to be filled, or a car salesman who receives a commitment to buy but then asks his or her assistant to enter the order into the computer. This formalistic approach would be difficult to reconcile with the broad language of the regulations and the statutory definition of “sale,” and it is in significant tension with the DOL’s past *168 practice. See 1949 Report 83 (explaining that the manufacturer’s representative was clearly “performing sales work regardless of the fact that the order is filled by the jobber rather than directly by his own employer”); Preamble 22162 (noting that “technological changes in how orders are taken and processed should not preclude the exemption for employees who in some sense make the sales”).
Petitioners additionally argue that detailers are the functional equivalent of employees who sell a “concept,” and they point to Wage and Hour Division opinion letters, as well as lower court decisions, deeming such employees nonexempt. See Brief for Petitioners 47-48. Two of these opinions, however, concerned employees who were more analogous to buyers than to sellers. See Clements v. Serco, Inc., 530 F. 3d 1224, 1229-1230, n. 4 (CA10 2008) (explaining that, although military recruiters “[i]n a loose sense” were “selling the Army’s services,” it was the Army that would “pa[y] for the services of the recruits who enlist”); Opinion Letter from DOL, Wage and Hour Div. (Aug. 19, 1994), 1994 WL 1004855 (explaining that selling the “concept” of organ donation “is similar to that of outside buyers who in a very loose sense are sometimes described as selling their employer’s ‘service’ to the person for whom they obtain their goods”). And the other two opinions are likewise inapposite. One concerned employees who were not selling a good or service at all, see Opinion Letter from DOL, Wage and Hour Div., FLSA 2006-16 (May 22, 2006), 2006 WL 1698305 (concluding that employees who solicit charitable contributions are not exempt), and the other concerned employees who were incapable of selling any good or service because their employer had yet to extend an offer, see Opinion Letter from DOL, Wage and Hour Div. (Apr. 20, 1999), 1999 WL 1002391 (concluding that college recruiters are not exempt because they merely induce qualified customers to apply to the college, and the college “in turn decides whether to make a contractual offer of its educational services to the applicant”).
*169 Finally, the dissent posits that the “primary duty” of a pharmaceutical detailer is not “to obtain a promise to prescribe a particular drug,” but rather to “providfe] information so that the doctor will keep the drug in mind with an eye toward using it when appropriate.” Post, at 174. But the record in this case belies that contention. Petitioners’ end goal was not merely to make physicians aware of the medically appropriate uses of a particular drug. Rather, it was to convince physicians actually to prescribe the drug in appropriate cases. See App. to Pet. for Cert. 40a (finding that petitioners’ “primary objective was convincing physicians to prescribe [respondent’s] products to their patients”).
* * *
For these reasons, we conclude that petitioners qualify as outside salesmen under the most reasonable interpretation of the DOL’s regulations. The judgment of the Court of Appeals is

Affirmed.

 This provision also exempts workers “employed in a bona fide executive, administrative, or professional capacity.” 29 U. S. C. § 213(a)(1).

 The definition also includes any employee “[w]hose primary duty is ... obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer.” 29 CFR § 541.500(a)(1)(ii). That portion of the definition is not at issue in this case.

 It is undisputed that petitioners were “customarily and regularly engaged away” from respondent’s place of business in performing their responsibilities.

 Congress imposed this requirement in 1951 when it amended the Federal Food, Drug, and Cosmetic Act (FDCA) to provide that drugs that are “not safe for use except under the supervision of a practitioner” may be dispensed “only . . . upon a . . . prescription of a practitioner licensed by law to administer such drug.” Durham-Humphrey Amendment of 1951, ch. 578, 65 Stat. 648-649 (codified at 21 U. S. C. § 353(b)). As originally enacted in 1938, the FDCA allowed manufacturers to designate certain drugs as prescription only, but “it did not say which drugs were to be sold by prescription or that there were any drugs that could not be sold without a prescription.” Temin, The Origin of Compulsory Drug Prescriptions, 22 J. Law & Econ. 91, 98 (1979). Prior to Congress’ enactment of the FDCA, a prescription was not needed to obtain any drug other than certain narcotics. See id., at 97.

 Respondent terminated Christopher’s employment in 2007, and Buchanan left voluntarily the same year to accept a similar position with another pharmaceutical company.

 The parties agree that the commitment is nonbinding.

 The median pay for pharmaceutical detailers nationwide exceeds $90,000 per year. See Brief for Respondent 14.

 The amount of incentive pay is not formally tied to the number of prescriptions written or commitments obtained, but because retail pharmacies are prohibited from dispensing prescription drugs without a physician’s prescription, retail sales of respondent’s products necessarily reflect the number of prescriptions written.

 Respondent also argued that petitioners were exempt administrative employees. The District Court and the Court of Appeals found it unnecessary to reach that argument, and the question is not before us.

 The DOL filed an amicus brief in the Ninth Circuit advancing substantially the same interpretation it had advanced in its brief in the Second Circuit. See Brief for Secretary of Labor as Amicus Curiae in No. 10-15257.

 The DOL invites “interested parties to inform it of private cases involving the miselassiñeation of employees in contravention of the new Part 541 rule” so that it may file amicus briefs “in appropriate cases to share *154 with courts the Department’s view of the proper application of the new Part 541 rule.” See DOL, Office of Solicitor, Overtime Security Amicus Program, http://www.dol.gov/sol/541amicus.htm (as visited June 15, 2012, and available in Clerk of Court’s case file).

 For example, it is unclear why a physician’s nonbinding commitment to prescribe a drug in an appropriate case cannot qualify as a sale under this test. The broad term “transaction” easily encompasses such a commitment. See Webster’s Third New Internationa] Dictionary 2425 (2002) (hereinafter Webster’s Third) (defining “transaction” to mean “a communicative action or activity involving two parties or two things reciprocally affecting or influencing each other”). A “consummated transaction” is simply a transaction that has been fully completed. See id., at 490 (defining “consummate” to mean “to bring to completion”). And a pharmaceutical sales representative who obtains such a commitment is “directly involv[ed]” in this transaction. Thus, once a pharmaceutical sales representative and a physician have fully completed their agreement, it may be said that they have entered into a “consummated transaction.”

 When pressed to clarify its position at oral argument, the DOL suggested that a “transfer of possession in contemplation of a transfer of title” might also suffice. Tr. of Oral Arg. 17.

 Neither petitioners nor the DOL asks us to accord controlling deference to the “consummated transaction” interpretation the Department advanced in its briefs in the Second Circuit and Ninth Circuit, nor could we given that the Department has now abandoned that interpretation. See Estate of Cowart v. Nicklos Drilling Co., 505 U. S. 469, 480 (1992) (noting that “it would be quite inappropriate to defer to an interpretation which has been abandoned by the policymaking agency itself”).

 Accord, Phelps Dodge Corp. v. Federal Mine Safety and Health Review Comm’n, 681 F. 2d 1189, 1192 (CA9 1982) (recognizing that “the application of a regulation in a particular situation may be challenged on the ground that it does not give fair warning that the allegedly violative conduct was prohibited”); Kropp Forge Co. v. Secretary of Labor, 657 F. 2d 119, 122 (CA7 1981) (refusing to impose sanctions where standard the regulated party allegedly violated “d[id] not provide ‘fair warning’ of what is required or prohibited”); Dravo Corp. v. Occupational Safety and Health Review Comm’n, 613 F. 2d 1227, 1232-1233 (CA3 1980) (rejecting agency’s expansive interpretation where agency did not “state with ascertainable certainty what is meant by the standards [it] ha[d] promulgated” (internal quotation marks omitted; emphasis deleted)); Diamond Roofing Co. v. Occupational Safety and Health Review Comm’n, 528 F. 2d 645, 649 (CA5 1976) (explaining that “statutes and regulations which allow monetary penalties against those who violate them” must “give an employer fair warning of the conduct [they] prohibi[t] or requir[e]”); 1 R. Pierce, Administrative Law Treatise § 6.11, p. 543 (5th ed. 2010) (observing that “[i]n penalty eases, courts will not accord substantial deference to an agency’s interpretation of an ambiguous rule in circumstances where the rule did not place the individual or firm on notice that the conduct at issue constituted a violation of a rule”).

 It appears that the DOL only once directly opined on the exempt status of detailers prior to 2009. In 1945, the Wage and Hour Division issued an opinion letter tentatively concluding that “medical detailists” who performed “work . . . aimed at increasing the use of [their employer’s] product in hospitals and through physicians’ recommendations” qualified as administrative employees. Applicability of Exemption for Administrative Employees to Medical Detailists, Letter Ruling (May 19,1945), 1 CCH Labor Law Service, Federal Wage-Hour Guide ¶ 33,093. But that letter did not address the outside salesman exemption.

 For instance, it “makes the job of a reviewing court much easier, and since it usually produces affirmance of the agency’s view without conflict in the Circuits, it imparts (once the agency has spoken to clarify the regulation) certainty and predictability to the administrative process.” Talk America, Inc. v. Michigan Bell Telephone Co., 564 U. S. 50, 69 (2011) (Scalia, J., concurring).

 Given that the FLSA provides its own definition of “sale” that is more expansive than the term’s ordinary meaning, the DOL’s reliance on dictionary definitions of the word “sale” is misplaced. See, e.g., Burgess v. United States, 553 U. S. 124, 130 (2008) (noting that “[w]hen a statute *163 includes an explicit definition, we must follow that definition” (internal quotation marks omitted)).

 The canon of ejusdem generis “limits general terms [that] follow specific ones to matters similar to those specified.” CSX Transp., Inc. v. Alabama Dept. of Revenue, 562 U. S. 277, 294 (2011) (alteration in original; internal quotation marks omitted).

 The dissent’s approach suffers from the same flaw. The dissent contends that, in order to make a sale, an employee must at least obtain a “firm commitment to buy.” Post, at 178 (opinion of Breyer, J.). But *164 when an employee who has extended an offer to sell obtains a “firm commitment to buy,” that transaction amounts to a “contract to sell.” Given that a “contract to sell” already falls within the statutory definition of “sale,” the dissent’s interpretation would strip the catchall phrase of independent meaning.

 In the past, we have stated that exemptions to the FLSA must be “narrowly construed against the employers seeking to assert them and their application limited to those [cases] plainly and unmistakably within their terms and spirit.” Arnold v. Ben Kanowsky, Inc., 361 U. S. 388, 392 (1960). Petitioners and the DOL contend that Arnold requires us to construe the outside salesman exemption narrowly, but Arnold is inappo-site where, as here, we are interpreting a general definition that applies throughout the FLSA.

 The dissent’s view that pharmaceutical detailers are more naturally characterized as nonexempt promotional employees than as exempt outside salesmen relies heavily on the DOL’s explanation in its 1940 Report that “sales promotion men” are not salesmen. See post, at 175; see also 1940 Report 46. There, the Department described a “sales promotion man” as an employee who merely “pavfes] the way for salesmen” and who *165 frequently “deals with retailers who are not customers of his own employer hut of his employer’s customer” and is “interested in sales by the retailer, not to the retailer.” Ibid. The dissent asserts that detailers are analogous to “sales promotion men” because they deal with “individuals, namely doctors, ‘who are not customers’ of their own employer” and “are primarily interested in sales authorized by the doctor, not to the doctor.” Post, at 175. But this comparison is inapt. The equivalent of a “sales promotion man” in the pharmaceutical industry would be an employee who promotes a manufacturer’s products to the retail pharmacies that sell the products after purchasing them from a wholesaler or distributor. Detail-ers, by contrast, obtain nonbinding commitments from the gatekeepers who must prescribe the product if any sale is to take place at all.

 Our point is not, as the dissent suggests, that any employee who does the most that he or she is able to do in a particular position to ensure the eventual sale of a product should qualify as an exempt outside salesman. See post, at 177 (noting that “the ‘most’ a California firm’s marketing employee may be able ‘to do’ to secure orders from New York customers is to post an advertisement on the Internet”). Rather, our point is that, when an entire industry is constrained by law or regulation from selling its products in the ordinary manner, an employee who functions in all relevant respects as an outside salesman should not be excluded from that category based on technicalities.

 According to one of respondent’s amici, most pharmaceutical companies “have systems in place to maintain the inventories of wholesalers and retailers of prescription drugs (consisting mainly of periodic restocking pursuant to a general contract), [and] these systems are largely ministerial and require only a few employees to administer them.” Brief for PhRMA 24; see also ibid, (explaining that one of its members employs more than 2,000 pharmaceutical sales representatives but “fewer than ten employees who are responsible for processing orders from retailers and wholesalers, a ratio that is typical of how the industry is structured”).