KAREN NELSON MOORE, Circuit Judge,
dissenting.
Congress passed the Clean Air Act (“CAA”) “to protect and enhance the quality of the Nation’s air resources so as to promote the public health and welfare and the productive capacity of its population.” 42 U.S.C. § 7401(b)(1). Because the majority hamstrings the Environmental Protection Agency’s (“EPA”) ability to pursue this mission by refusing to defer to the agency’s reasonable interpretation of its own regulation, I respectfully dissent.
I. REVIEW OF AGENCY ACTION
As the majority acknowledges, we defer to an agency’s interpretation of its own ambiguous regulation as “controlling” unless that interpretation is “ ‘plainly erroneous or inconsistent with the regulation.’ ” Auer v. Robbins, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) (quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 359, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989)); Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 413-14, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945); Claiborne-Hughes Health Ctr. v. Sebelius, 609 F.3d 839, 844 (6th Cir.2010). As in the context of agency interpretation of statutes, judicial deference to an agency’s interpretation of regulations is premised on the relative institutional expertise and political accountability of an agency as compared to a court; moreover, an agency’s authority to interpret its own regulations implementing a statute is incident to the authority to interpret that statute. See Matthew C. Stephenson & Miri Pogoriler, Seminole Rock’s Domain, 79 Geo. Wash. L. Rev. 1449, 1456-57 (2011).
In addition to the deference we give to administrative interpretations of regulatory language, we will not overturn agency action unless it is “arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.” 5 ' U.S.C. § 706(2)(A); see also Motor Vehicle Mfrs. Ass’n, Inc. v. State Farm Mut. Auto. Ins. Co. (State Farm), 463 U.S. 29, 42-43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).
II. MAJOR-SOURCE AGGREGATION
The EPA will aggregate the emissions of multiple stationary sources to determine if the sources together constitute a major source if those sources (1) “are under common control of the same person,” (2) “are located on one or more contiguous or adjacent properties,” and (3) “belong[] to a *752 single major industrial grouping.” 40 C.F.R. § 71.2. In this case, the EPA determined that Summit’s sour-gas wells, flares, and gas-sweetening plant, which are connected by a dedicated underground pipeline and are used exclusively as part of a single, interconnected operation, together constituted a major source. As part of its determination that Summit’s various stationary sources were located on adjacent properties, the EPA considered the fact that those sources were functionally interrelated.
The majority bases its conclusion that the EPA’s interpretation of its own regulation was impermissible on three factors: the plain meaning of the word “adjacent,” the regulatory history of CAA major-source aggregation determinations, and policy considerations. In my view, none of these factors prevent us from deferring to the EPA and upholding its decision in this case.
A. The Meaning of “Adjacent”
The majority peruses several dictionaries and concludes that “adjacent” refers to the physical or geographical relationship between two or more objects. The objects must be “not distant,” “next to,” “close to,” or “immediately preceding or following.” The EPA’s interpretation of its Title V regulations to allow for consideration of functional interrelatedness in adjacency determinations does not contradict this plain meaning of the word “adjacent.” The ultimate question remains whether two properties are physically close enough to be considered adjacent for the purposes of aggregation under Title V. The EPA’s position is simply that other factors in addition to absolute physical distance can be relevant in determining whether two objects that are a given distance apart are close enough to be considered adjacent in this context. The EPA does not contend that multiple stationary sources are adjacent simply because they are functionally interrelated, and the majority either misunderstands or mischaracterizes the agency’s position in so describing it.
In this more limited sense, “adjacent” is ambiguous. The fact that “adjacent” refers to the distance between two objects does not explain what factors go into a determination of whether two objects that are a given distance apart are “next to” each other, “close,” or “immediately preceding or following.” The cited definitions do not unambiguously foreclose the consideration of factors other than absolute physical distance.[1] One object in a sequence “immediately preced[es] or follow[s]” the next item in the sequence, for example. Two objects that are physically connected fall “next to” each other along that connection. Two or more stationary sources that are functionally interrelated can similarly be described as “next to” each other; one follows the other in a common process.
Moreover, functional interrelatedness can inform the determination of whether two objects that are a given distance apart are adjacent. If two properties are close enough to each other to house stationary sources that contribute to the same interrelated operation, and only to that operation, those properties are more likely to be close enough reasonably to be considered adjacent. Likewise, the EPA could reasonably conclude that two or more sources that exist only as part of the same larger process or sequence will likely be *753 close enough to each other to be considered adjacent. As the EPA recognizes, circumstances may exist in which the distance between two stationary sources is too great for those sources to be considered adjacent, even if they are functionally interrelated. This fact does not mean that interrelatedness can never be a factor, but that it will not support a finding of adjacency in that instance.
The consistency of the EPA’s approach with the regulation is apparent from the record in this case. The EPA did not ignore the physical dimension of adjacency; the EPA’s decision to aggregate Summit’s wells, flares, and plant was not, as the majority alleges, made “irrespective of the distance that separates them.” Distance was a factor in concluding that the various sources were located on adjacent properties. In its April 26, 2007 letter to Summit, for example, the EPA requested a map showing the location of each emission unit, as well as the potential to emit of each unit located within one mile of the gas-sweetening plant. Pet’r App. at 31. The EPA discussed the distance between Summit’s gas-sweetening plant, gas wells, and flares in its October 18, 2010 letter explaining its decision to aggregate each source in Summit’s operations as a major source, noting, for example, that “it appears that there are a dozen or more sour gas wells within a one mile-radius of the sweetening plant.” Resp. App. at 90-91 & n.21. If the EPA had truly considered only functional interrelatedness, it would have declared Summit’s operation to be a major source in its initial April 2007 letter after noting that each source was interrelated and would not have sought additional information regarding the distance between the emission units and the plant. See Pet’r App. at 31.
Moreover, in Summit’s case, functional interrelatedness has a physical dimension; each stationary source is connected via a dedicated pipeline. The operation is thus not only functionally interrelated but physically interconnected. Each source (gas well, flare, and sweetening plant) is a stop along a single physically connected process; each well is “next to” and “immediately precedes]” the following well, for example. Nothing outside of this process either physically or functionally interrupts the traverse of gas from an underground field through the gas wells and past the flares to the sweetening plant. The properties on which each well or flare are located are likewise connected to each other, and to the property on which the plant is located.[2]
The EPA’s position thus comports with the plain meaning of the word “adjacent” as a description of the geographical relationship between two objects. The EPA uses interrelatedness only to determine whether two properties are close enough to each other to be considered adjacent. Functional interrelatedness thus operates only in that realm of adjacency that is ambiguous; it does not replace proximity, but serves as a means of determining proximity. Accordingly, deference is warranted.
The majority’s cited caselaw does not dictate a contrary result. Indeed, the majority’s “most persuasive authority” on the meaning of “adjacent” within the CAA regulations is a Supreme Court decision that involved a different statute and did not purport to provide a general definition of *754 the word “adjacent.”[3] In Rapanos v. United States, 547 U.S. 715, 740-42, 126 S.Ct. 2208, 165 L.Ed.2d 159 (2006), which dealt with the Clean Water Act (“CWA”), a plurality of the Court concluded that, for a wetland to fall within the meaning of “waters of the United States” and thus be subject to regulation under the CWA, the wetland must actually abut a navigable waterway. In its earlier opinion in United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985), the Court had held that the Army Corps of Engineers’s interpretation of the CWA to cover certain wetlands was reasonable because the precise boundary between water and land is not always clear and an expert agency is best positioned to decide how far the CWA’s regulatory scope should extend in such situations; in Riverside Bayview, the Court had described the wetlands that could be regulated under the CWA as those that were “adjacent” to navigable waters. Rapanos, 547 U.S. at 740-41, 126 S.Ct. 2208. Because only wetlands that actually abut waters implicate the issue of how to determine a land/water boundary, the Court in Rapanos clarified that its use of the word “adjacent” in Riverside Bayview meant only physically abutting and, accordingly, that only those wetlands that physically abut navigable waters could be considered adjacent to such waters for CWA purposes. Id. at 742, 126 S.Ct. 2208. Indeed, the plurality expressly stated that “[i]n expounding the term ‘adjacent’ as used in Riverside Bayview, we are explaining our own prior use of that word to interpret the definitional phrase ‘the waters of the United States’ ” and that “[hjowever ambiguous the term may be in the abstract, ... ‘adjacent’ as used in Riverside Bayview is not ambiguous between ‘physically abutting’ and merely ‘nearby.’ ” Id. at 747-48, 126 S.Ct. 2208. Given the specific, limited nature of this discussion, it really has no applicability to any inquiry into the meaning of “adjacent” more generally or in any other context. In determining otherwise, the majority mistakes the sea for the air, leaving the fish and the fowl confused.
If anything, Rapanos actually undermines Summit’s position by demonstrating that the meaning of “adjacent” is contextual and that the determination of whether two objects are adjacent can depend upon the purpose for which the adjacency decision is being made. In Rapanos, the question was how close a wetland must be to navigable waters to qualify as “waters of the United States,” and the Court held that “adjacent” in that context meant physically abutting because only abutting wetlands could reasonably constitute “waters” at all. See id. at 741 n. 10, 126 S.Ct. 2208. Different factors are relevant when the question is how close multiple stationary sources must be to each other to qualify as an aggregated major source.
Because “adjacent” is ambiguous as to how to determine whether two objects that are a given distance apart should be considered adjacent, we should defer to the EPA’s decision to consider functional interrelatedness as a means of making that determination. Moreover, the values which deference promotes would be served by doing so. Whether two or more stationary sources are located on adjacent properties goes to whether the EPA should aggregate those individual sources; ultimately, the regulatory term that the EPA is interpreting when considering whether properties are adjacent is “major *755 source.” See 40 C.F.R. § 71.2.[4] The consequence of aggregating the various stationary sources within an operation is that the operation will be subject to the CAA’s Title V permitting requirements, and whether an industrial operation should be subject to CAA regulations is a decision best left to the expert agency tasked with enforcing that law. The EPA’s aggregation decisions reflect its institutional expertise regarding how various industrial operations affect air quality. In all its talk of adjacency, the majority forgets the purpose of the adjacency determination. To mix environmental metaphors, the majority’s analysis of the EPA’s clean-air regulations misses the forest for the trees.
B. Regulatory History
In concluding that it would not defer to the EPA’s interpretation of “adjacent” even if it found that term to be ambiguous, the majority relies heavily on the Preamble to the EPA’s 1980 regulations defining “stationary source” under the CAA’s Prevention of Significant Deterioration program, in which the EPA explained its decision not to adopt functional interrelatedness as an independent factor that applied to all aggregation determinations across all industries. See 45 Fed. Reg. 52,676, 52,693-95 (Aug. 7, 1980). The majority first reasons that the EPA would not have considered adding a separate intexrelatedness requirement if adjacency and interrelatedness are the same. This argument is logical, but misconstrues the EPA’s position. The EPA does not equate adjacency with interrelatedness; the latter is a factor that in some cases can help determine whether the requirement of the former is met. Because adjacency does not depend upon interrelatedness, the latter would have had independent force as a separate requirement.
Next, the majority characterizes the Preamble as a categorical rejection of any consideration of functional interrelatedness. Although the Preamble rejects interrelatedness as “another abstract factor” to be analyzed in all aggregation determinations, 45 Fed. Reg. at 52,695, nothing in the Preamble forecloses the possibility that interrelatedness could be relevant in a specific aggregation determination or otherwise rejects interrelatedness as a criterion that could be considered within the adjacency analysis. As discussed below, functional interrelatedness in the gas-drilling industry is both particularly pertinent and less likely to involve the kind of “subjective” assessments or “fine-grained analyses” that the EPA cited as reasons not to adopt interrelatedness as an across-the-board requirement, see id. Moreover, the historical record belies the majority’s characterization of the Preamble as a categorical rejection of interrelatedness. The EPA considered interrelatedness in its aggregation determinations within ten months of the 1980 Preamble — evidence that the consideration of interrelatedness is not a recent phenomenon that somehow deviates from the agency’s original regulatory intent. See Letter from Edward Reich, EPA to Steve Rothblatt, EPA Region V (June 30, 1981) (concluding that “two facilities [that] are approximately one mile apart, have a dedicated railroad line between them and are programmed together to produce one line of automobiles ... can be considered adjacent”).
The Preamble also makes clear that aggregation as a major source is warranted if *756 an operation reflects the “common sense notion of [a] plant,” and that the three requirements for aggregation — common ownership, adjacency, and a shared industrial grouping — are intended to answer that question. See 45 Fed. Reg. at 52,694-95. Different industries are structured differently. In the oil and gas industry, activities that in other contexts might be housed within a single building may instead be spread out across different parcels of land. Viewing the distance between two facilities in a drilling operation in light of their functional interrelatedness thus serves the purpose of identifying operations that reflect the “common sense notion of [a] plant.”
Finally, the fact that the EPA’s aggregation determination in this case is somewhat inconsistent with the policy preferences expressed in the withdrawn Wehrum Memo does not render that determination impermissible. The Wehrum Memo relies on policy reasons for focusing on distance rather than interrelatedness, not an argument based on the meaning of “adjacent.” Similarly, the Wehrum Memo would not need to identify physical proximity as “the most informative factor” in an adjacency determination if it was the only possible factor. See Pet’r App. at 35.
C. Policy Considerations
Our role is not to judge the wisdom of agency action, but its permissibility. To the extent that Summit’s policy-based challenges to the EPA’s interpretation of its own Title V regulations are even relevant, they do not hold up to scrutiny.
Summit and the majority stress the value of predictability in a regulatory regime and emphasize that the EPA itself recognized the danger of having to conduct “numerous, fine-grained analyses” in aggregation determinations. See 45 Fed. Reg. at 52,695. What Summit and the majority fail to recognize, however, is that such concerns are not implicated in this case. Summit’s operations are clearly interrelated. Each well supplies sour gas only to Summit’s gas-sweetening plant. The plant does not receive sour gas from any other source. Each unit is physically connected by dedicated pipeline. Summit does not contend otherwise. No “highly subjective” or “fine-grained analys[i]s” was required.[5]
Moreover, the EPA has long considered interrelatedness as a factor in major-source aggregation determinations, including in the oil and gas industry, so Summit cannot credibly claim surprise that the agency did so in this case. The concern that deference to an agency’s interpretation of its own regulations would “require regulated parties to divine the agency’s interpretations in advance or else be held liable when the agency announces its interpretations for the first time in an enforcement proceeding and demands deference” is not implicated. Christopher v. Smith-Kline Beecham Corp., — U.S. — —, 132 S.Ct. 2156, 2168, 183 L.Ed.2d 153 (2012). The majority is correct that a longstanding agency interpretation is not worthy of deference if that interpretation conflicts with the regulation; absent such conflict, however, the longstanding duration of an agency’s interpretation certainly weighs towards deference. See Barnhart v. Walton, *757 535 U.S. 212, 219-20, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002).
Further, as the majority recognizes, “adjacent” does not have a set meaning as to any specific distance. Absent a bright-line rule as to how far is too far for numerous sources to be considered adjacent, any aggregation determination that considers distance alone could involve the very “subjective” assessments and “fine-grained analyses” that Summit fears. Stripped of the ability to consider the interrelatedness of Summit’s wells and plant, the EPA would have had to consider the distance between each individual well, along with the distance between each well and the plant, and decide whether each distance was too far to be considered adjacent. In Summit’s case, this process could require over one hundred separate adjacency determinations. Other drilling operations that are similarly structured but cover different distances or traverse different landscapes might not be able to rely on the determination in Summit’s case in predicting whether they would be subject to aggregation.
The majority’s adoption of Summit’s position raises its own policy concerns. Primarily, today’s ruling frees the oil and gas industry to gerrymander its way out of Title V regulation. So long as sufficient distance exists between each well (so that they are not “adjacent” as the majority defines that term), or someone other than the drilling company owns parcels of land in between each well (so that they are not “contiguous”), the drilling operation cannot be classified as a major source through aggregation. Unlike the CAA provisions governing hazardous air pollutant emissions, see 42 U.S.C. § 7412(n)(4), Title V does not grant the oil and gas industry immunity from aggregation; this court should not effectively create such a provision when Congress has not done so.
III. CONCLUSION
Because I believe that the EPA’s consideration of functional interrelatedness as a factor along with physical distance in its adjacency determination was both reasonable (and thus worthy of deference) and correct, I would affirm its decision to aggregate the various stationary sources in Summit’s drilling operation as a major source. Recognizing that the majority concludes otherwise, I note in closing that, aside from essentially holding that functional interrelatedness is an impermissible factor to consider, the majority does not find that any other aspect of the EPA’s aggregation determination was flawed under the Administrative Procedure Act and the standards for agency decisionmaking articulated in State Farm, 463 U.S. at 42-43, 103 S.Ct. 2856. On remand, then, the EPA is free to reach the same conclusion that Summit’s operations should be aggregated as a major source for Title V permitting purposes, so long as it bases that conclusion on the considerations that the majority today deems appropriate. See Sec. & Exch. Comm’n v. Chenery Corp., 332 U.S. 194, 196, 200-01, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947).

. The majority acknowledges that "adjacent” does not refer to any specific distance and that context matters as to whether two objects that are a given distance apart are adjacent, but then contradictorily concludes that the EPA cannot consider any factor other than distance in deciding whether two stationary sources are located on adjacent properties.

. Although the EPA does not rely on this fact, the underground fields from which the gas is drawn extend beyond the individual parcels of land on which each gas well or flare is located. The different locations within the field from which each well draws gas are thus not only physically proximate, but are actually contiguous.

. The majority's other proffered caselaw is notably sparse. We do not typically find much persuasive authority in unpublished decisions of the Massachusetts Land Court, for example.

. It is worth noting that Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 840, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the grandparent of agency-deference cases, involved the EPA's interpretation of "stationary source” in a different section of the CAA.

. The length of time and volume of paperwork in this case, bemoaned by the American Petroleum Institute, are likely nothing more than the familiar symptoms of a large bureaucracy. Unfortunate as they may be, they are not the result of the EPA's use of interrelatedness as a factor. Indeed, the EPA concluded that Summit's operations were interrelated fairly early in the process, informing Summit of this conclusion in its initial response to Summit's source-determination request in April 2007. See Pet'r App. at 31.