FLAUM, Circuit Judge,
concurring in part and concurring in the judgment.
I join in full Judge Hamilton’s analysis of USA Funds’ preemption argument and Bible’s RICO claim. With respect to Bible’s breach of contract claim, I agree with the portion of the analysis that defers to the Secretary of Education’s interpretation of the statute and corresponding regulations. However, I am unable to join subsection II.A.l.b.i of Judge Hamilton’s opinion, which offers an alternative ground for holding that USA Funds was prohibited from assessing collection costs against Bible — that is, that the text of the regulations unambiguously supports Bible’s interpretation of the statutory and regulatory scheme. Instead, I find the regulatory landscape sufficiently complex to merit deference to the agency’s reasonable interpretation.
In order to bring Bible’s rehabilitation agreement within the purview of 34 C.F.R. § 682.410(b)(5)(ii)’s prohibition on the imposition of collection costs, we are necessarily required to infer that Bible’s rehabilitation agreement qualifies as a “repayment agreement on terms satisfactory to the [guaranty] agency.” And while Judge Hamilton assumes from the outset that “rehabilitation agreement” and “repayment agreement” are overlapping concepts, in my view, this is no small inferential leap.
Judge Manion, in his dissent, makes a strong case for the proposition that the two concepts are separate and distinct, and thus, that the repayment agreement provisions of § 682.410(b)(5)(ii) do not apply to the loan rehabilitation program described in 34 C.F.R. § 682.405. Indeed, the Department of Education’s website lists “Loan Repayment” and “Loan Rehabilitation” as independent options for “getting your loan out of default.” Fed. Student Aid, U.S. Dep’t of Educ., Getting out of Default, https://studentaid.ed.gov/sa/repayloans/default/get-out (last visited Aug. 5, 2015). Moreover, there is no cross-reference or other textual indication in the regulations suggesting that the rehabilitation agreements described in § 682.405 constitute repayment agreements “on terms sat *662 isfactory to the agency” under § 682.410(b)(5)(ii), such that a rehabilitation agreement might fall within the scope of § 682.410(b)(5)(ii)’s exception to the general rule that collection costs will be assessed against borrowers in default. Rather, the sole reference to collection costs in § 682.405 appears to assume the assessment of collection costs in the rehabilitation context. See § 682.405(b)(l)(vi)(B) (explaining that the guaranty agency must inform a borrower entering into a rehabilitation agreement “[o]f the amount of any collection costs to be added to the unpaid principal of the loan when the loan is sold to an eligible lender, which may not exceed 18.5 percent of the unpaid principal and accrued interest on the loan at the time of the sale”).
Further, it is unsurprising that a rehabilitation agreement may not qualify as “satisfactory” to a guarantor. The language of § 682.410(b)(5)(ii) suggests that a guaranty agency retains discretion in determining which terms render a repayment agreement “satisfactory.” Under § 682.405, however, guaranty agencies have almost no discretion in setting the terms of rehabilitation agreements: the regulation requires that a borrower’s monthly repayment amount be “Reasonable and affordable,” § 682.405(b)(l)(i), and sets forth specific guidelines to which a guarantor must adhere in calculating that amount. See § 682.405(b)(l)(iii) (“The guaranty agency initially considers the borrower’s reasonable and affordable payment amount to be an amount equal to 15 percent of the amount by which the borrower’s Adjusted Gross Income (AGI) exceeds 150 percent of the poverty guideline amount applicable to the borrower’s family size and State, divided by 12, except that if this amount is less than $5, the borrower’s monthly rehabilitation payment is $5.”). The regulation also specifies that “[t]he agency may not impose any other conditions unrelated to the amount or timing of the rehabilitation payments in the rehabilitation agreement.” § 682.405(b)(l)(vi). It is therefore no great leap to conclude that rehabilitation agreements and repayment agreements “on terms satisfactory to the agency” are mutually exclusive concepts.
On the other hand, Judge Hamilton’s position that the rehabilitation agreements described in § 682.405 are a subset of the repayment agreements referenced in § 682.410(b)(5)(ii) is intuitively appealing. After all, just like other forms of loan repayment, rehabilitation offers borrowers a path back to good standing, and does not permit them to avoid eventual repayment in full. See § 682.405(b)(4) (explaining that “[a]n eligible lender purchasing a rehabilitated loan must establish a repayment schedule that meets the same requirements that are applicable to other FFEL Program loans of the same loan type as the rehabilitated loan”).
Moreover, I am skeptical of the dissent’s assertion that the regulations shield from collection costs only those borrowers who agree to immediate repayment of the full outstanding balance of their defaulted loans. The repayment agreement provision, § 682.410(b)(5)(ii), was clearly drafted with the intent to permit borrowers who have lapsed into default the opportunity to regain good standing and to avoid many of the adverse consequences — i.e., report to a credit bureau and assessment of collection costs — associated with default. Yet to make that opportunity available only to those borrowers capable of immediately paying their outstanding loan balance in full would render this second chance illusory. Practically speaking, it would be impossible for the vast majority of borrowers in default — who presumably have defaulted on their loans as a result of their inability to make far lower monthly payments— to eliminate the entirety of their student *663 debt (which could easily reach into the tens of thousands of dollars) in a single payment. And I think it unlikely that, in drafting this regulation, the Secretary sought to exclude nearly every borrower in default from its purview.
In sum, while I question certain aspects of each of my respected colleagues’ positions, they both offer plausible readings of this complex and ambiguous regulatory scheme. I therefore believe the appropriate course of action is to accept the guidance that we sought from the Secretary of Education. Under the Supreme Court’s decision in Auer v. Robbins, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997), it is generally appropriate to defer to an agency’s interpretation of its own regulations, even when that interpretation is informally announced. See Christopher v. SmithKline Beecham Corp., — U.S. -, 132 S.Ct. 2156, 2159, 183 L.Ed.2d 153 (2012) (“Auer ordinarily calls for deference to an agency’s interpretation of its own ambiguous regulation, even when that interpretation is advanced in a legal brief____”). Here, the Secretary has unequivocally advanced the position that the applicable regulations do not permit a guaranty agency to assess collection costs against a first-time defaulted borrower who timely enters into a rehabilitation agreement and fully complies with that agreement. Given the regulations’ lack of clarity with respect to this issue, I cannot conclude that the Secretary’s position is either plainly erroneous or inconsistent with the regulations. See L.D.G. v. Holder, 744 F.3d 1022, 1029 (7th Cir.2014). Accordingly, I join that portion of Judge Hamilton’s analysis that relies on administrative deference. ’ I note, however, that while the Secretary’s amicus filing has proven helpful in resolving this dispute, an unambiguous regulatory scheme is preferable to soliciting the agency’s interpretive guidance. Thus, while I accept the Secretary’s proffered interpretation here, perhaps the Department might consider reexamining and revising the language of the regulations.