IN THE

# ARIZONA COURT OF APPEALS

## DIVISION ONE

HERITAGE AT CAREFREE LLC,
*Plaintiff/Appellant*,

*v.*

ARIZONA DEPARTMENT OF HEALTH SERVICES,
*Defendant/Appellee*.

No. 1 CA-CV 19-0399
FILED 7-16-2020

Appeal from the Superior Court in Maricopa County
No. LC2018-000158-001
The Honorable Patricia A. Starr, Judge

**AFFIRMED**

COUNSEL

Jennings, Strouss & Salmon, P.L.C., Phoenix
By Jimmie W. Pursell, Jr.
*Counsel for Plaintiff/Appellant*

Arizona Attorney General's Office, Phoenix
By Patricia Cracchiolo LaMagna, Aubrey Joy Corcoran
*Counsel for Defendant/Appellee*

**OPINION**

Presiding Judge Samuel A. Thumma delivered the opinion of the Court, in
which Judge Randall M. Howe and Chief Judge Peter B. Swann joined.

**T H U M M A**, Judge:

**¶1**         Through an owner and an employee's family member, Heritage at Carefree Senior Living held powers of attorney for two of its residents. The Arizona Department of Health Services (ADHS) found this conduct violated an administrative rule and imposed a $2,200 civil penalty. After unsuccessful challenges administratively and in superior court, this appeal followed. Because Heritage has shown no error, the administrative decision finding violations and imposing a civil penalty is affirmed.

## FACTS AND PROCEDURAL HISTORY

**¶2**         As an assisted living facility, Heritage is subject to regulations enacted to ensure the health and safety of its residents and prevent exploitation of those residents. *See generally* Ariz. Rev. Stat. (A.R.S.) §§ 36-132(A)(1), -405(A), -405(B)(2) (2020); Ariz. Admin. Code (A.A.C.) R9-10-801 to -820 (2020).[1] Among other things, Heritage, through its manager, is required to "ensure that policies and procedures are . . . established, documented, and implemented to protect the health and safety of" residents, including for "staffing and recordkeeping," "resident medical records," "health care directives" and training. A.A.C. R9-10-803(C)(1)(h), (l) & (o). To protect against possible exploitation, an ADHS Rule mandates that Heritage shall "[n]ot act as a resident's representative and not allow an employee or a family member of an employee to act as a resident's representative for a resident who is not a family member of the employee." A.A.C. R9-10-803(G)(1). The application of this Rule is dispositive here.

**¶3**         In July 2016, ADHS received a complaint that Heritage owner Daniela Holbura held a power of attorney (POA) for a resident in violation of the Rule. ADHS reviewed Heritage's medical records for the resident and found two POAs that "designate[d] and appoint[ed]" Holbura as the resident's "agent:" (1) a durable business POA, effective when signed, and (2) a durable medical POA, effective upon the resident's disability. Both POAs were signed, witnessed and notarized in August 2014. When interviewed, the resident apparently did not recall that Holbura was her designated agent. Holbura, however, told ADHS that the resident signed the POAs when applying for benefits, and Holbura admitted knowing

---

[1]Absent material revisions after the relevant dates, statutes and rules cited refer to the current version unless otherwise indicated.

about the POAs. Although Holbura stated she had not exercised either POA, she admitted they "were still in place and had not been revoked."

¶4        ADHS notified Heritage of these Rule violations and allowed Heritage to submit a plan of correction. ADHS required that any plan of correction would need to specify "[h]ow the deficiency is to be corrected, on both a temporary and permanent basis" and "the monitoring system [Heritage] will use to prevent the deficiency from recurring." Although Heritage had a right to dispute the deficiencies, instead, Heritage submitted a plan of correction that ADHS accepted in January 2017.

¶5        The same day it accepted Heritage's plan of correction, ADHS received another complaint against Heritage for financial exploitation of a resident. This second complaint alleged that Roxana Meicke, the daughter of a Heritage employee, held POAs for another Heritage resident. ADHS reviewed Heritage's medical records and service plans for the resident. *See* A.A.C. R9-10-801(9), -811(C)(10). These documents in Heritage's files noted the resident, who suffered from dementia, had signed POAs designating Meicke as her agent. Although Heritage was obligated to retain copies of POAs, *see id*. R9-10-811(C)(3), the POAs for this resident were not located in Heritage's files.

¶6        When contacted by ADHS, Meicke provided a copy of a health care POA in her favor that the resident signed in December 2016, the same day the resident was admitted to Heritage. As part of its investigation, ADHS interviewed the resident, who reported that Meicke told the resident to sign the POA "to get a better rate at the facility." The ADHS investigative report indicates that Meicke, who was not related to the resident, had access to the resident's bank accounts "to pay bills." The resident, however, had not received bank statements and did not know the status of those accounts. The report adds that, in December 2016, a Heritage employee knew Meicke was the resident's medical POA and knew Meicke "was working to become" the financial POA. Meicke said she never exercised the POA.

¶7        After investigating this second complaint, ADHS initiated an enforcement proceeding. In September 2017, based on the "pattern, type and severity of the . . . violations, . . . [causing] a direct risk to the life, health and safety of patients at" Heritage, ADHS issued a notice of assessment imposing an $11,000 civil penalty. Heritage challenged that notice. After an evidentiary hearing, an administrative law judge (ALJ) found the evidence showed the POAs violated the Rule and "create[d] the potential for exploitation of a vulnerable population that the rules are designed to protect." The ALJ's recommended decision found Heritage violated the

Rule by failing "to review its files and take other steps to ensure it is in compliance with ADHS regulations." The ALJ, however, recommended the penalty be reduced to $2,000 because neither Holbura nor Meicke had "taken . . . action . . . on behalf of the residents that harmed the residents." On review, ADHS accepted the ALJ's findings and conclusions but increased the penalty to $2,200.

¶8        Heritage appealed and the superior court affirmed. This court has jurisdiction over Heritage's timely appeal from the superior court's decision pursuant to Article 6, Section 9, of the Arizona Constitution and A.R.S. §§ 12-913,[2] -120.21(A)(1) and -2101(A)(1).

## DISCUSSION

¶9        This court will affirm an agency's decision unless it is "contrary to law, is not supported by substantial evidence, is arbitrary and capricious or is an abuse of discretion." A.R.S. § 12–910(E). Legal conclusions are reviewed de novo, *Cooke v. Ariz. Dep't of Econ. Sec.*, 232 Ariz. 141, 144 ¶ 13 (App. 2013), without deference "to any previous determination" of law by the agency, A.R.S. § 12–910(E).

### I.        Heritage Has Not Shown ADHS Erred in Finding It Violated the Rule.

¶10        The Rule mandates that Heritage shall "[n]ot *act* as a resident's representative and not *allow* an employee or a family member of an employee to *act* as a resident's representative for a resident who is not a family member of the employee." A.A.C. R9-10-803(G)(1) (emphasis added). Claiming "act" and "allow" each has only one meaning, and the terms are unambiguous, Heritage argues it did not "act" as a resident's representative and did not "allow" Holbura or Meicke do so, meaning it did not violate the Rule.

¶11        In considering the text of the Rule, "[w]hen the language is clear and unambiguous, and thus subject to only one reasonable meaning," the court applies "the language without using other means of statutory construction." *State v. Gomez*, 212 Ariz. 55, 57 ¶ 11 (2006); *see also* A.R.S. § 1-213. When faced with ambiguity, however, this court will construe a word "in a way that avoids absurdity and fulfills the legislature's purpose;" to

---

[2] Notwithstanding its reference to "the supreme court," A.R.S. § 12-913 "has been construed as also allowing an appeal to the court of appeals, which was created after § 12-913 was enacted." *Svendsen v. Ariz. Dep't of Transp., Motor Vehicle Div.*, 234 Ariz. 528, 533 ¶ 13 (App. 2014).

that end, this court "consider[s] context, subject matter, historical background, effects, consequences, spirit, and purpose" of the statute or regulation, *Mail Boxes v. Indus. Comm'n of Ariz.*, 181 Ariz. 119, 122 (1995), "and the evil which it was designed to remedy," *Calvert v. Farmers Ins. Co. of Ariz.*, 144 Ariz. 291, 294 (1985).

### A. The Record Shows Heritage Did Act As The Residents' Representative.

¶12 Heritage argues the term "act" is unambiguous and, then pressing a narrow reading of the term, argues it did not violate the Rule because it never used the POAs. In making this argument, Heritage erroneously assumes that, by securing and retaining the POAs for a resident or allowing an employee's family member to do so, Heritage did not "act as a resident's representative" or "allow an employee or a family member of an employee to act as a resident's representative." A.A.C. R9-10-803(G)(1). That assumption, however, is false.

¶13 The POAs granted Holbura and Meicke broad authority as agents of the resident who signed them. *See* A.R.S. § 36-3223(B) ("An agent's authority to make health care decisions on behalf of the principal is limited only by the express language of the health care power of attorney."); A.R.S. § 14-5501(D) (under a POA, an agent may "make financial decisions on the principle's behalf"). The record does not show that Holbura or Meicke used the POAs. But that does not end the inquiry.

¶14 Heritage's records included POAs in favor of Holbura signed in August 2014. The health care POA expressly "supercede[d] any prior agreement" the resident had with health care providers regarding disclosure of medical records, and both POAs "supercede[d] and revoke[d]" any prior POAs by the resident. The record reflects that Holbura learned of the POAs naming her as agent at about the time they were signed but did nothing to prevent their signing or to disclaim them. Heritage then received and retained copies of those POAs. By accepting POAs that superceded and revoked all prior POAs for the resident and retaining them in its records, Heritage did "act as a resident's representative" and did "allow" its employee Holbura to do so. A.A.C. R9-10-803(G)(1).

¶15 The violation by Meicke is even more direct: Meicke did "act as a resident's representative" when she signed the updated service plan on behalf of the resident in January 2017. *See* A.A.C. R9-10-803(G)(1). Heritage argues Meicke's doing so was inconsequential because a service plan is only "for informational purposes." The regulations, however, require a service plan for each resident directing the "amount, type, and frequency of

assisted living services being provided to the resident, including medication administration or assistance in the self-administration of medication" and sets forth the "level of service the resident is expected to receive." A.A.C. R9-10-808(A)(3)(b), (c). Moreover, Heritage points to no "informational purposes" exception to the Rule. And Heritage has no answer for the requirement that a service plan be signed by the resident or the resident's representative "when initially developed," and, as here, "when updated." A.A.C. R9-10-808(A)(5).

**¶16**       Heritage notes Meicke signed the service plan as the resident's representative because the resident had gout. Although apparently true, the possibility that a resident would become infirm is one of the reasons for the prohibitions in the Rule, not an exception to the Rule's application. Similarly, although Heritage is correct that a friend could help provide information included in the service plan, A.A.C. R9-10-808(A)(2)(c), -810(C)(10), only the resident or the resident's authorized representative could sign the service plan. In these ways, through Holbura and Meicke, Heritage violated the Rule.

**¶17**       Arguing "act" as used in the Rule is unambiguous, Heritage quotes three alternative dictionary definitions for the term: "to take action," "to perform a specified function" or "to produce an effect." Heritage contends that, because its conduct does not match any of these alternative definitions, it did not violate the Rule. The Rule, however, does not use any of these alternative definitions Heritage identifies. Moreover, these alternative definitions fatally undercut the argument that the Rule can have only one meaning. The dictionary cited by Heritage, merriam-webster.com, offers numerous potentially applicable alternative definitions for "act." *Act*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/act (last visited July 2, 2020). Given that "act" as used in the Rule reasonably can be read to have more than one meaning, the court properly can look to secondary textual interpretation principles, including context, subject matter and the harm the Rule was designed to prevent. *Mail Boxes*, 181 Ariz. at 122 (1995); *Calvert,* 144 Ariz. at 294.[3]

---

[3] This approach is consistent with the cases Heritage cites, although it cites those cases for a different proposition. *See Walgreen Ariz. Drug Co. v. Ariz. Dep't of Revenue*, 209 Ariz. 71, 76 ¶ 21 (App. 2004) (rejecting an argument, in a tax case, that the "definition of 'sales' is a straightforward concept that is susceptible of a plain-reading construction"); *Sun City Grand Cmty. Ass'n v.*

¶18 Heritage is governed by statutes and regulations designed to ensure the health and safety of its residents and prevent their exploitation. *See generally* A.R.S. §§ 36-132(A)(1), -405(A), -405(B)(2); A.A.C. R9-10-801 to -820. Under those regulations, Heritage must ensure that its residents are not subject to "Exploitation; Coercion; Manipulation"; . . . [or] Misappropriation of personal and private property by the assisted living facility's manager," employees or volunteers. A.A.C. R9-10-810(B). These regulations, including the Rule, are to prevent "a direct *risk* to the life, health or safety of patients or residents." A.R.S. § 36-401(A)(45) (emphasis added); *accord* A.A.C. R9-10-111(A). "Risk," in turn, is "the *potential* for an adverse outcome." A.C.C. R9-10-101(200) (emphasis added). These regulations, including the Rule, are to be read liberally, construed to effectuate these legitimate, protective purposes. *See* A.R.S. § 1-211(B) ("Statutes shall be liberally construed to effect their objects and to promote justice.").

¶19 Heritage argues that, because "no harm occurred to the residents" there could be no violation of the Rule. ADHS, however, was not required to wait until Heritage harmed a resident to enforce the Rule. Moreover, Heritage fails to account for the risk of catastrophic harm its violation of the Rule created. The POAs in favor of Holbura revoked all other POAs for the same subjects and Heritage concedes Holbura could not act on those POAs. Accordingly, if that resident had a medical emergency, no one would have held a valid POA to act as an agent for the resident to direct emergency treatment. ADHS properly can enact and enforce regulations like the Rule to prevent such potentially disastrous results.

¶20 Heritage next argues that "[n]ot every action pursuant to a POA is harmful or exploitive." Although true, even under Heritage's view, the Rule prohibits Holbura and Meicke from using the POAs. So, although the Rule does not prohibit using all POAs, the Rule does prohibit Heritage and its employees and their family members from doing so.

¶21 Heritage admits that a prohibited POA allows an employee to be "in a position" to violate the Rule. Moreover, there is no dispute that such a person acting on a POA could exploit or harm a resident. Heritage argues, however, that neither Holbura nor Meicke would do so because Heritage, as a "regulated facility" aware that acting on the POAs here "will subject the facility and manager to civil penalties and potential licensing consequences." But notwithstanding that awareness, Heritage retained the

*Maricopa Cty.*, 216 Ariz. 173, 178–79 ¶¶ 18, 23 (App. 2007) (construing ambiguous terms to avoid absurd results).

prohibited POAs in its records for an extended period and knew that a prohibited person held a prohibited POA for another resident. Heritage did nothing to prevent that and took no corrective action until complaints were raised and ADHS investigated. ADHS can enact and enforce regulations, like the Rule, to prevent such avoidable harm. *See* A.A.C R9-10-111 (authorizing ADHS enforcement action if "the violation poses a direct risk to the life, health, or safety of a patient"). That is precisely what happened here.

### B. Heritage Did Allow Holbura and Meicke to Act.

**¶22** Citing an *American Heritage Dictionary* definition of "allow" as "to permit, authorize, enable, entitle, consent to," Heritage argues that "to violate the Rule, Heritage must have known about the 'act' of representation . . . then have permitted it to happen." *Allow*, *The American Heritage Dictionary* (4th ed. 2006). Heritage speculates that, otherwise, "a resident could name a Heritage employee as a POA, without that employee's or Heritage's knowledge, then revoke that designation only minutes later, and Heritage would still be liable for violating the Rule." Heritage's argument fails for several reasons.

**¶23** Heritage's hypothetical is not presented here. Heritage either held the prohibited POAs in its records or the records for the resident reflect their existence. More importantly, by citing a single narrow dictionary definition, Heritage ignores other definitions for "allow." Indeed, merriam-webster.com, the primary dictionary Heritage cites, includes definitions for "allow" that include "to fail to restrain or prevent." *Allow*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/allow (last visited July 2, 2020). Given ADHS' charge to ensure the health and safety of residents of assisted living facilities and to prevent exploitation of these residents, Heritage provides no persuasive reason why its narrow construction of "allow" should govern. An assisted living facility that possesses a prohibited POA violates the Rule. Where an assisted living facility does not possess the prohibited POA, it will not violate the Rule by "allow[ing] an employee or a family member of an employee" to be an agent under the prohibited POA, unless it knew or had reason to know of the prohibited POA.

**¶24** Here, the prohibited POAs naming Holbura were in Heritage's records. Therefore, Heritage did "allow" Holbura to "act as a resident's representative." A.A.C. R9-10-803(G)(1). For Meicke, although Heritage did not have copies of the POAs, it knew or should have known that Meicke was an agent identified in a prohibited POA. Along with

Meicke's signing the resident's service plan for the resident, the resident's records held by Heritage list Meicke's name by the question "POA?" and note elsewhere the POA was responsible for transportation. ADHS' investigation revealed that a Heritage employee knew Meicke was the resident's agent under a POA at about the same time the resident was admitted to Heritage. And to the extent Heritage had any doubts, an investigation going beyond asking the resident with dementia would have been appropriate. *See* A.C.C. R9-10-811(C)(3) (requiring policies and procedures to ensure medical records document resident's representative). On this record, Heritage knew or should have known that Meicke was the resident's agent under a POA. These facts support the finding that Heritage did "allow" Meicke to "act as a resident's representative." A.A.C. R9-10-803(G)(1).

## II.     Heritage Had Sufficient Notice of the Conduct the Rule Prohibits.

**¶25**          Heritage argues the $2,200 penalty was improper because ADHS did not give fair warning that the conduct here violated the Rule. *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156 (2012) ("agencies should provide regulated parties fair warning of the conduct [a regulation] prohibits or requires") (quotation omitted). Unlike in *Christopher*, however, Heritage has not alleged a long-standing practice of ADHS' acquiescence to violations of the Rule. In August 2016, after ADHS discovered the Holbura POAs, ADHS sent Heritage a statement outlining why Heritage violated the Rule and ordered Heritage to take steps to comply. In January 2017, Heritage submitted a plan of correction for those violations and made no claim it lacked notice of what the Rule prohibited. This first violation, and Heritage's responsive plan of correction, put Heritage on notice of what the Rule required. Accordingly, Heritage had sufficient notice of what conduct the Rule prohibits.

## III.    The Civil Penalty Was Not Arbitrary or Capricious.

**¶26**          Heritage argues the $2,200 civil penalty was excessive and arbitrary and capricious and the result of an improper investigation. This court reviews that decision for an abuse of discretion. *Maricopa Cty. Sheriff's Office v. Maricopa Cty. Employee Merit Sys. Comm'n*, 211 Ariz. 219, 223 ¶ 17 (2005); *see* A.R.S. § 12–910(E).

**¶27**          ADHS has the discretion to assess a civil penalty, A.A.C. R9-10-111(A)(2), based on actual or potential harm, *see* A.A.C. R9-10-101(200). The civil penalty imposed must not exceed $500 "for each violation," and "[e]ach day that a violation occurs constitutes a separate violation." A.R.S. § 36-431.01(A). Here, ADHS had the discretion to impose a civil penalty fare

larger than the penalty imposed. Accordingly, the $2,200 penalty was well within what the Rule authorized and well within ADHS' discretion.[4]

## CONCLUSION

**¶28** The administrative decision finding violations and imposing a civil penalty is affirmed. Because Heritage is not the successful or prevailing party, its request for attorneys' fees and costs is denied. ADHS is awarded its taxable costs on appeal contingent upon its compliance with Ariz. R. Civ. App. P. 21.



AMY M. WOOD • Clerk of the Court
FILED:    AA

---

[4] Heritage summarily asserts that ADHS did not conduct a thorough investigation. The record does not support this argument, nor does Heritage specify what else ADHS should have done or not done investigate. Accordingly, Heritage has shown no error regarding the ADHS investigation.