# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued October 13, 2020          Decided December 22, 2020

No. 20-1006

NATIONAL LIFELINE ASSOCIATION,
PETITIONER

v.

FEDERAL COMMUNICATIONS COMMISSION AND UNITED
STATES OF AMERICA,
RESPONDENTS

———

On Petition for Review of an Order of the
Federal Communications Commission

———

*John J. Heitmann* argued the cause for petitioner. With him on the briefs was *James B. Currier, Jr.*

*Maureen K. Flood*, Counsel, Federal Communications Commission, argued the cause for respondents. With her on the brief were *Makan Delrahim*, Assistant Attorney General, U.S. Department of Justice, *Michael F. Murray*, Deputy Assistant Attorney General, *Robert B. Nicholson* and *Andrew DeLaney*, Attorneys, *Thomas M. Johnson, Jr.*, General Counsel, Federal Communications Commission, *Ashley S. Boizelle*, Deputy General Counsel, and *Jacob M. Lewis*, Associate General Counsel. *Richard K. Welch*, Deputy Associate General Counsel, Federal Communications Commission, entered an appearance.

Before: KATSAS and RAO, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: The Federal Communications Commission (the "Commission" or "FCC") runs the Lifeline program ("Lifeline"), which offers low-income consumers discounts on telephone and broadband Internet access service. Qualified consumers receive service from eligible telecommunications carriers, or "ETCs," who in turn receive a monthly federal support payment for each Lifeline subscriber they serve. In 2005, "the Commission decided to allow non-facilities-based providers (or 'wireless resellers') to provide Lifeline services." *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1108 (D.C. Cir. 2019) (as amended Apr. 10, 2019). To offer service to their subscribers, reseller ETCs usually purchase usage allotments from facilities-based carriers who possess their own wireless networks.

Many ETCs, including some resellers, use a standard fee-for-service model, in which subscribers pay the ETC a recurring, discounted monthly fee in exchange for service. A substantial number of reseller ETCs, however, offer prepaid wireless plans for which ETCs receive monthly Lifeline support payments on behalf of subscribers.

Since 2012, the Commission has adopted several reforms to the Lifeline support payment process. Currently, FCC rules require ETCs to initiate a process of de-enrolling Lifeline subscribers on prepaid plans who have not used their Lifeline service within the preceding 30 days. 47 C.F.R. § 54.405(e)(3) (2019). After 30 days of non-usage, such subscribers enter a 15-day "cure period." At the beginning of the cure period,

subscribers' ETCs are required to notify them that continued non-usage will result in service termination. During the cure period, however, ETCs must continue to provide Lifeline service to non-use subscribers. However, if such a subscriber uses Lifeline service during those 15 days, the non-usage is "cured" and that subscriber may remain in the Lifeline program.

The issue in this case concerns support payments to ETCs for prepaid Lifeline subscribers in cure periods because of their non-usage of the service. Two provisions of the FCC's rules are most notably in play. One provision states that ETCs will receive payments for each "actual qualifying low-income customer[] [the ETC] serves directly as of the first of the month." *Id.* § 54.407(a). Another provision states that for prepaid Lifeline plans, an ETC "shall only continue to receive [support payments] for . . . subscribers who have used the service within the last 30 days, or who have cured their non-usage." *Id.* § 54.407(c)(2). In 2018, Petitioner National Lifeline Association ("Petitioner") – an industry trade group composed primarily of Lifeline service providers – filed a Petition for Declaratory Ruling (the "Petition") with the FCC requesting that "the Commission permit Lifeline ETCs to seek reimbursement for all Lifeline subscribers served on the first day of the month, including those subscribers receiving free-to-the-end-user Lifeline service who are in the 15-day cure period per the Commission's non-usage rules." Bridging the Digital Divide for Low-Income Consumers, 34 FCC Rcd. 10,886, 10,936 (Oct. 30, 2019) ("2019 Lifeline Order"), Joint Appendix ("J.A.") 56. Petitioner primarily relied on 47 C.F.R. § 54.407(a). The Commission denied the Petition, holding that the plain text of § 54.407(c)(2) controlled. *See* 34 FCC Rcd. at 10,937.

In January 2020, Petitioner filed a Petition for Review with this court, contending that the FCC's denial of its Petition for Declaratory Ruling was contrary to the applicable statute, inconsistent with the Commission's rules, arbitrary and capricious, and resulted in unconstitutional regulatory takings. For the reasons explained below, we reject Petitioner's claims.

Petitioner's statutory argument – that the Commission's interpretation of its applicable rules violates 47 U.S.C. § 214(e) – is foreclosed because Petitioner did not raise this claim with the FCC in the first instance. *See* 47 U.S.C. § 405(a). We also reject Petitioner's challenge to the FCC's interpretation of § 54.407. The Commission's position is compelled by the unambiguous terms of the rules. We therefore find no merit in Petitioner's claim because it rests on an untenable construction of the disputed rules. Finally, we find no merit in any of the other claims before the court. We therefore dismiss the Petition for Review as to Petitioner's statutory argument and deny all other claims.

## I. BACKGROUND

### A. Lifeline Service

In 1985, the Commission created the Lifeline program by regulation "to ensure that low-income consumers had access to affordable, landline telephone service following the divesture of AT&T." *Nat'l Lifeline Ass'n*, 921 F.3d at 1106 (citing MTS and WATS Market Structure; and Establishment of a Joint Board; Amendment, 50 Fed. Reg. 939 (Jan. 8, 1985)). In 1996, Congress codified the program. *Mozilla Corp. v. FCC*, 940 F.3d 1, 68 (D.C. Cir. 2019) (per curiam) (citing 47 U.S.C. §§ 214, 254).

The Commission's rules require the Universal Service Administrative Company (the "Administrator") to administer

the Commission's universal services programs, including the Lifeline program. *See* 47 C.F.R. § 54.701(a). In that role, the Administrator – an independent, not-for-profit corporation, *see* Changes to the Board of Directors of the National Exchange Carrier Association, Inc., 12 FCC Rcd. 18,400, 18,418-19 (July 17, 1997) – is responsible for, among other things, disbursing support payments to ETCs. *See* 47 C.F.R. § 54.702(b). However, the Administrator's role is relatively narrow: It "may not make policy, interpret unclear provisions of the [applicable] statute or [the Commission's] rules, or interpret the intent of Congress." *Id.* § 54.702(c). And, where the applicable statute "or the Commission's rules are unclear, or do not address a particular situation, the Administrator [must] seek guidance from the Commission." *Id.*

Between 2005 – when the Commission first allowed wireless resellers to participate in Lifeline – and 2012, Lifeline support disbursements more than doubled, from under $1 billion annually to approximately $2.2 billion. *See* 2019 Lifeline Order at 10,888, J.A. 8. As this growth in Lifeline occurred, so did waste, fraud, and abuse in the program. *See id.* at 10,889, J.A. 9. In response, the Commission took several steps designed to combat these problems without undermining the goals of the program. *See, e.g.*, Lifeline and Link Up Reform and Modernization, 27 FCC Rcd. 6656, 6670 (Jan. 31, 2012) ("2012 Lifeline Order"); 2019 Lifeline Order at 10,893, J.A. 13.

As mentioned above, many ETCs, including some resellers, use a standard fee-for-service model, in which subscribers pay the ETC a monthly fee in exchange for service. *See* 2012 Lifeline Order at 6767-68. Other reseller ETCs instead offer prepaid wireless plans. *See* 2019 Lifeline Order at 10,888, J.A. 8. For these plans, reseller ETCs often provide subscribers with a free phone and a set amount of monthly

service. *See id.* Regardless of their fee structure, ETCs receive Lifeline support payments for their active Lifeline subscribers. *See* 2012 Lifeline Order at 6767. Fee-for-service ETCs use these payments to discount each Lifeline subscriber's recurring monthly fee for ongoing service. *See id.* at 6767-68. For prepaid plans, however, Lifeline subscribers are not required to make recurring payments to their ETC; instead, the ETCs receive the Lifeline support payments on behalf of such subscribers. *See id.* at 6768. Thus, for prepaid plans, ETCs have no regular billing arrangement with – and, sometimes, little ongoing contact with – their Lifeline subscribers. *See id.*

In 2012, the Commission issued an Order establishing a centralized database listing all Lifeline subscribers – the National Lifeline Accountability Database ("NLAD") – in order "to detect and prevent duplicative support" attributable to individual subscribers. 2012 Lifeline Order at 6734. To populate the database, ETCs enter Lifeline subscriber data. *Id.* at 6737-39. The ETCs and Administrator then must take steps to ensure that there are no duplicative support payments disbursed for individual Lifeline subscribers. *See id.* at 6743-44, 6748-49.

The 2012 Lifeline Order also required ETCs to begin a process of "de-enrolling" prepaid Lifeline subscribers who had not used their Lifeline service in the prior 60 days. *Id.* at 6768-69. The Commission explained that, due to the lack of a regular billing relationship between ETCs and these subscribers, there is a significant risk of "phantom accounts" for which the subscriber is not "receiving the benefit of the supported service." *Id.* at 6771. In particular, "[t]he possibility that a wireless phone has been lost, is no longer working, or the subscriber has abandoned or improperly transferred the account is much greater." *Id.* As a result, for prepaid plans,

"there may be no other means beside usage patterns to track whether a consumer" is still actually using Lifeline service. *Id.*

Rather than simply requiring ETCs to shut off prepaid Lifeline service once there had been 60 days of non-usage, the Commission allowed these subscribers a "cure period" of 30 days. *See id.* at 6875. At the beginning of the cure period, the ETC was required to notify the subscriber that continued non-usage would result in service termination. *See* 47 C.F.R. § 54.405(e)(3) (2012). During the cure period, the ETC was required to continue providing Lifeline service to the subscriber. *See id.* And if the subscriber used the Lifeline service during that period, the non-usage was "cured" and the subscriber remained in the Lifeline program. *See id.* From 2012 through 2016, subscriber usage was considered an outbound call, purchase of additional talk time, answering a call from someone other than the ETC, or actively confirming to the ETC a desire to retain Lifeline service. *See id.* § 54.407(c)(2)(i)-(iv).

Along with these changes, the Commission revised 47 C.F.R. § 54.407(c) to restrict support payments attributable to prepaid Lifeline subscribers who had not used their Lifeline service for extended periods. To that end, the version of section 54.407(c)(2) adopted in the 2012 Lifeline Order provided that for prepaid Lifeline subscribers, ETCs would "only continue to receive universal service support reimbursement for . . . subscribers who have used the service within the last 60 days, or who have cured their non-usage."

While the 2012 Lifeline Order established a de-enrollment process and timeline, it did not require ETCs to submit Lifeline support payment requests to the Administrator based on subscribership levels as of particular dates. As a result, ETCs submitted their requests to the Administrator reflecting their number of Lifeline subscribers for different days each month.

Lifeline and Link Up Reform and Modernization, 30 FCC Rcd. 7818, 7898 (June 18, 2015) ("2015 Lifeline Order"). In 2015, to further reduce waste in the program and to make the Administrator's operations more efficient, the Commission revised 47 C.F.R. § 54.407(a) to require a uniform "snapshot date" – the first day of the month – for support payment requests. *See id.*; *id.* at 7926. This provision is known as the "Snapshot Rule," as it requires an ETC to take a "snapshot" of its Lifeline subscribers as of the first of the month in order to file requests for reimbursements attributable to those subscribers.

In 2016, the Commission issued an Order mandating creation of the National Lifeline Eligibility Verifier (the "National Verifier"), an operations system with a central database for Lifeline subscriber records building off the NLAD. *See* Lifeline and Link Up Reform and Modernization, 31 FCC Rcd. 3962, 4006, 4010, 4016-17 (Mar. 31, 2016) ("2016 Lifeline Order"). To reflect these changes, the Commission again revised the text of 47 C.F.R. § 54.407(a), with Lifeline support payments provided to ETCs "based on the number of actual qualifying low-income customers [they] serve[] directly as of the first day of the month found in the National Verifier." *Id.* at 4131. Other 2016 reforms included reducing the non-usage period resulting in notification of possible de-enrollment from 60 days to 30 days and reducing the cure period from 30 days to 15 days. *Id.* at 4115. The Commission also decided that sending a text message could serve as "usage" of a subscriber's Lifeline service. *Id.* at 4114.

Thus, by October 2016, 47 C.F.R. § 54.407(a) stated that "[u]niversal service support for providing Lifeline shall be provided directly to an eligible telecommunications carrier based on the number of *actual qualifying low-income customers it serves directly as of the first day of the month*"

(emphasis added). In turn, 47 C.F.R. § 54.405(e)(3) required ETCs to continue to provide service to prepaid Lifeline subscribers in non-usage cure periods. And 47 C.F.R. § 54.407(c)(2), which applied solely to prepaid Lifeline service, stated that ETCs could "only continue to receive . . . reimbursement for such Lifeline service provided to subscribers who have used the service within the last 30 days, or who have cured their non-usage as provided for in § 54.405(e)(3)." These regulatory provisions remain substantively the same today.

### B. Procedural History

In late 2016, numerous ETCs approached the FCC's Wireline Competition Bureau (the "Bureau") seeking to "clarify the interplay between" the foregoing rules. Petition at 2-3, J.A. 148-49. According to Petitioner, the Bureau provided informal guidance that non-usage cure period Lifeline subscribers on prepaid plans as of snapshot dates could be included in reimbursement requests. *Id.* at 3, J.A. 149. The Administrator then posted on its website that "[Lifeline s]ervice providers must provide[] eligible subscribers with service during the cure period and *may include subscribers in the cure period in their monthly snapshot*." Petition Ex., J.A. 158 (emphasis added). As a result, from late 2016 through late 2017, ETCs included prepaid cure period subscribers in Lifeline support payment requests. *See* Comments of Sprint Corp. at 1, J.A. 133.

In late 2017, the Administrator reversed its position, revised its website, and required ETCs to remove non-usage cure period subscribers from their monthly snapshots. *See id.* The Administrator's website also explained that ETCs could upwardly adjust a previous month's claims to receive

reimbursement for subscribers who subsequently cured their non-usage. *See* Petition at 3, J.A. 149.

On February 7, 2018, Petitioner filed the Petition for Declaratory Ruling with the Commission, advancing several arguments in support of its view that ETCs should receive payments for prepaid Lifeline subscribers in non-usage cure periods as of snapshot dates. *See* J.A. 147-56. First, Petitioner claimed that the text of 47 C.F.R. §§ 54.405(e)(3) and 54.407(a) mandated that ETCs receive payments for prepaid Lifeline subscribers in non-usage cure periods. *See id.* at 4-5, J.A. 150-51. Second, Petitioner argued that the Administrator had exceeded its authority in changing its view. *See id.* at 6-7, J.A. 152-53. Lastly, according to Petitioner, denial of the Petition would be arbitrary and capricious or otherwise unlawful. *See id.* at 7-10, J.A. 153-56. In particular, Petitioner claimed that such action would be unjustified, *see id.* at 7-8, J.A. 153-54, would harm ETCs' reasonably held reliance interests, *see id.* at 8, J.A. 154, would undermine the purposes of the Lifeline program, *see id.* at 9, J.A. 155, and could result in an unconstitutional regulatory taking, *see id.* at 9-10, J.A. 155-56. The Petition did not claim that the Commission lacked statutory authority to adopt the rules in place.

Three ETCs filed Comments with the Commission in support of the Petition. In addition to endorsing the Petition's arguments, the ETCs advanced their own arguments. First, Sprint Corporation ("Sprint") asserted that the Commission should allow support payments for cure period subscribers because ETCs incur costs to provide such subscribers with service. *See* Comments of Sprint at 2-3, J.A. 134-35. Second, Smith Bagley, Inc. ("Smith Bagley") explained that ETCs receive support payments for subscribers in cure periods facing de-enrollment for reasons other than non-usage. *See* Comments of Smith Bagley at 5, J.A. 141. Smith Bagley thus argued that

"[t]he Commission's reimbursement rules do not provide a basis" to treat *non-usage* cure period support payments differently. *See id.* at 6, J.A. 142. Third, Q Link Wireless LLC ("Q Link") expanded on Petitioner's argument that denial of the Petition would result in an unconstitutional taking. *See* Comments of Q Link at 2-3, J.A. 145-46.

On November 14, 2019, the Commission published the 2019 Lifeline Order denying the Petition. 2019 Lifeline Order at 10,937, J.A. 57. According to the Commission, the plain language of its rules mandated that ETCs exclude non-usage cure period subscribers from support payment requests. *See id.* In interpreting 47 C.F.R. § 54.407(a) and (c)(2), the Commission stated that the specific provision, section 54.407(c)(2), controlled over the more general provision, section 54.407(a). *Id.* at 10,938, J.A. 58. In addition, the Commission rejected the claim that ETCs reasonably relied on the Administrator's website, because content posted on the website was known to offer only informal, nonbinding advice. *Id.* at 10,937 & n.338, J.A. 57. The Commission also noted that after its 2015 adoption of the Snapshot Rule, some of Petitioner's members effectively acknowledged in submissions to the FCC that non-usage cure period subscribers were to be excluded from support payment requests. *See id.* at 10,938 & n.339, J.A. 58. Finally, the Commission rejected the takings arguments. The Commission noted that neither Petitioner nor the commenting ETCs had quantified the economic impact of excluding non-usage cure period subscribers from reimbursement requests, and the FCC viewed any such impact as "light." *See id.* at 10,938-39, J.A. 58-59.

## II. ANALYSIS

### A. Standards of Review

The Petition for Review challenges the Commission's interpretation of its rules covering the Lifeline Program. The Petition for Review does not assert that the Commission lacked statutory authority to adopt and enforce the rules on which the Commission relied in the disputed Order.

An agency may receive deference when it reasonably interprets its own "genuinely ambiguous" regulations. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019); *see also Auer v. Robbins*, 519 U.S. 452, 461 (1997). However, the Court made it clear in *Kisor* that "if there is only one reasonable construction of a regulation – then a court has no business deferring to any other reading, no matter how much the agency insists it would make more sense." *Id*. at 2415.

Ambiguity, however, is necessary but not sufficient for us to afford deference. The court must also ask "whether the character and context of the agency interpretation entitles it to controlling weight." *Kisor*, 139 S. Ct. at 2416 (citing *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012)).

The Supreme Court has set forth some guiding principles to determine whether an agency's interpretation of its own regulations is entitled to deference. First, the interpretation at issue "must be one actually made by the agency." *Id.* at 2416. That is, "it must be the agency's 'authoritative' or 'official position,' rather than any more ad hoc statement not reflecting the agency's views." *Id.* (quoting *United States v. Mead Corp.*, 533 U.S. 218, 257-59, 258 n.6 (2001) (Scalia, J., dissenting)). Second, "the agency's interpretation must in some way implicate its substantive expertise." *Id.* at 2417. Third, "an

agency's reading of a rule must reflect 'fair and considered judgment' to receive . . . deference." *Id.* (quoting *Christopher*, 567 U.S. at 155). Lastly, "[an] agency's reading must fall 'within the bounds of reasonable interpretation.' And let there be no mistake: That is a requirement an agency can fail." *Id.* at 2416 (quoting *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013)).

In determining whether a disputed agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), the party challenging the action bears the burden of proof, *City of Olmsted Falls v. FAA*, 292 F.3d 261, 271 (D.C. Cir. 2002) (citation omitted). "Under this highly deferential standard of review, the court presumes the validity of agency action and must affirm unless the Commission failed to consider relevant factors or made a clear error in judgment." *Cellco P'ship v. FCC*, 357 F.3d 88, 93-94 (D.C. Cir. 2004) (internal quotation marks and citations omitted).

Finally, we review constitutional challenges to agency action *de novo*. *See C-SPAN v. FCC*, 545 F.3d 1051, 1054 (D.C. Cir. 2008) (citing *Jifry v. FAA*, 370 F.3d 1174, 1182 (D.C. Cir. 2004)).

**B. Standing**

Petitioner asserts, and the Commission does not contest, that it has standing. We agree.

"In order to establish Article III standing, a plaintiff 'must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *N.Y. Stock Exch. LLC v. SEC*, 962 F.3d 541, 552 (D.C. Cir. 2020) (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (as

revised May 24, 2016)). "An association has standing to bring suit on behalf of its members when: (1) 'its members would otherwise have standing to sue in their own right;' (2) 'the interests it seeks to protect are germane to the organization's purpose;' and (3) 'neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 596 (D.C. Cir. 2015) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

It is clear that some of the ETCs that are members of Petitioner would have standing to sue in their own right. As a result of the 2019 Lifeline Order, ETCs have not received support payments for prepaid Lifeline subscribers who are in cure periods on snapshot dates. *See* Decl. of David B. Dorwart, Final Br. for Pet'r Addendum 2 ("Dorwart Decl.") ¶¶ 5-7. Even if this harm is small, as the Commission supposes, it is an injury-in-fact nonetheless. Furthermore, this injury is traceable to the Commission's determination that such support payments are not allowed under its rules. And, if this court were to grant the Petition for Review, it would redress the ETCs' injuries by mandating reimbursement for cure period Lifeline subscribers moving forward. Thus, any ETCs offering prepaid Lifeline service have standing to challenge the denial of the Petition in the 2019 Lifeline Order. Several such ETCs are members of Petitioner. *See* Dorwart Decl. ¶¶ 3-5, 7. Because "at least one of its members would have standing," this first requirement for associational standing is satisfied. *See Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002).

Petitioner also satisfies the second requirement. "The germaneness requirement mandates 'pertinence between litigation subject and organizational purpose.'" *Ctr. for Sustainable Econ.*, 779 F.3d at 597 (quoting *Humane Soc'y of the U.S. v. Hodel*, 840 F.2d 45, 58 (D.C. Cir. 1988)). Petitioner

exists to "represent[] [ETCs] serving low-income consumers participating in the Lifeline program." Dorwart Decl. ¶ 2. As an organization, it "supports the expanded availability and affordability of the Lifeline program and advocates for reduced barriers to program participation for low-income consumers and the ETCs that serve them." *Id.* ¶ 9. Here, the lack of support payments attributable to non-usage cure period Lifeline subscribers – and the possible economic impact on Petitioner's members – obviously is related to those goals. An ETC's operations may be affected in the absence of support payments. This consideration is sufficient to satisfy the germaneness requirement. And "[t]his is not a case in which an organization seeks to litigate an issue about which it has little expertise and does not much care." *Ctr. for Sustainable Econ.*, 779 F.3d at 597.

Finally, Petitioner satisfies the third requirement for associational standing. "Member participation is not required where a 'suit raises a pure question of law' and neither the claims pursued nor the relief sought require the consideration of the individual circumstances of any aggrieved member of the organization." *Id.* (quoting *Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 287 (1986)). Petitioner raises several arguments before this court, but all are legal questions principally related to the Commission's interpretation of its regulations in the 2019 Lifeline Order. And "the relief [Petitioner] seeks is invalidation of agency action," rather than any remedy particularized to individual members. *See id.* Therefore, members of Petitioner do not need to participate in the proceedings.

In sum, it is clear from the record in this case that Petitioner has associational standing to press its arguments before this court.

## C. Petitioner's Statutory Argument

In the claims presented to the court, Petitioner belatedly asserts that the Commission's interpretation of its applicable rules violates 47 U.S.C. § 214(e). That statutory provision requires an ETC to "offer *the services* that are supported by Federal universal service support mechanisms" within designated service areas. 47 U.S.C. § 214(e)(1)(A) (emphasis added). According to Petitioner, "the service[]" at issue here is not just voice or broadband service for Lifeline subscribers, but "*discounted* voice/broadband service" specifically. Final Br. for Pet'r at 47. Thus, Petitioner asserts that denial of the Petition in the 2019 Lifeline Order violates section 214(e)(1)(A) because – for non-usage cure period subscribers – ETCs "cannot offer a *supported* Lifeline service . . . if [they] do[] not receive reimbursement." *Id.* at 47-48 (emphasis added). This claim was never raised with the Commission. Therefore, the issue has been forfeited.

> 47 U.S.C. § 405(a) states, in relevant part, that
>
> a petition for reconsideration shall not be a condition precedent to judicial review of any [Commission] order, decision, report, or action, *except* where the party seeking such review . . . *relies on questions of fact or law upon which the Commission . . . has been afforded no opportunity to pass*.

47 U.S.C. § 405(a) (emphases added). We have "strictly construed" § 405(a), and have made it clear that we will not review arguments that have not first been presented to the Commission. *In re: Core Commc'ns, Inc.*, 455 F.3d 267, 276 (D.C. Cir. 2006) (citation omitted); *Qwest Corp. v. FCC*, 482 F.3d 471, 474 (D.C. Cir. 2007). "Thus, even when a petitioner has no reason to raise an argument until the FCC issues an order that makes the issue relevant, the petitioner must file a petition

for reconsideration with the Commission before it may seek judicial review." *Globalstar, Inc. v. FCC,* 564 F.3d 476, 484 (D.C. Cir. 2009) (citation and internal quotation marks omitted).

Neither the Petition nor any of the supporting Comments that were submitted to the Commission alleged that denial of the Petition would violate 47 U.S.C. § 214(e). In fact, neither Petitioner nor any other complaining party raised any statutory arguments, save for their general argument that denial of the Petition would violate the Administrative Procedure Act. Rather, they relied on textual, policy, and constitutional arguments. As a result, the FCC was never put on notice that Petitioner meant to challenge the Commission's statutory authority to adopt the interpretation at issue in this case. We therefore dismiss the Petition for Review as to this argument.

**D. The Lifeline Rules Unambiguously Foreclose Payments to ETCs for Subscribers in Prepaid Plans Who Have Not Used Lifeline Service for 30 Consecutive Days or Who Have Not Cured Their Nonusage**

The principal issue in this case concerns Petitioner's claim that the Commission misinterpreted its established regulations, not that the agency impermissibly promulgated a new rule. In addition, Petitioner does not challenge the legality of any existing rule covering the Lifeline program. Indeed, any such challenge would likely be untimely. *See Vernal Enters., Inc. v. FCC*, 355 F.3d 650, 655 (D.C. Cir. 2004) (explaining that petitions for review of Commission orders outside of certain enumerated situations "must be filed within 60 days of the date of public notice" (citing 28 U.S.C. § 2344)).

As explained above, there has been some confusion in recent years over de-enrolling Lifeline subscribers on prepaid

plans for non-usage and how ETCs should be paid for those subscribers. To address the situation, the Commission entertained Petitioner's request for declaratory relief and then issued the Order that is now the subject of review in this case. And counsel for the FCC conceded during oral argument that the agency's denial of the Petition in the 2019 Lifeline Order is final and subject to review. *See* Tr. of Oral Arg. at 27:19.

In support of its interpretation, the Commission rests primarily on section 54.407(c)(2). Since 2012, this provision has stated that when an ETC does not charge its subscribers a monthly fee for Lifeline service, it "shall only continue to receive universal service support reimbursement for such Lifeline service provided to subscribers who have used the service within [a specified time period], or who have cured their non-usage." 47 C.F.R. § 54.407(c)(2). In the Commission's view, the explicit restriction in section 54.407(c)(2) is a clear exception to the more general rule that Lifeline subsidies shall be provided to ETCs for Lifeline subscribers the ETC "serves directly as of the first day of the month." 47 C.F.R. § 54.407(a).

In response, Petitioner asserts that section 54.407(c)(2) does not, in any way, relate to whether ETCs may receive support payments for non-usage cure period subscribers. Instead, according to Petitioner, that regulatory provision merely "creates a process for eliminating *future* reimbursement for de-enrolled subscribers once the non-usage and cure periods both have elapsed." Final Br. for Pet'r at 44; *accord* Final Reply Br. for Pet'r at 5. Thus, in Petitioner's view, "[n]owhere does [section 54.407(c)(2)] prohibit Providers from claiming Lifeline reimbursement for cure period subscribers still enrolled in the program and served as of the snapshot date." Final Reply Br. for Pet'r at 5. Instead, Petitioner believes

the outcome is controlled by the text of the Snapshot Rule, 47 C.F.R. § 54.407(a), and 47 C.F.R. § 54.405(e)(3).

Petitioner is correct that section 54.407(a) appears, at first blush, to require support payments for all "actual qualifying low-income customers" whom ETCs serve as of the first day of a month. And section 54.405(e)(3) appears to require that ETCs must provide service to non-usage cure period subscribers on prepaid plans. However, Petitioner is mistaken in claiming that section 54.407(c)(2) does nothing more than "create[] a process for eliminating *future* reimbursement for de-enrolled [Lifeline] subscribers." Final Br. for Pet'r at 44. As the Commission noted in the 2019 Lifeline Order, the plain text of section 54.407(c)(2) prohibits support payments for prepaid Lifeline subscribers in non-usage cure periods: ETCs "*shall only continue to receive* universal service support reimbursement for such Lifeline service provided to subscribers who have *used the service within the last 30 days*, or *who have cured their non-usage*." 47 C.F.R. § 54.407(c)(2) (emphases added); *see* 2019 Lifeline Order at 10,937-38. Prepaid Lifeline subscribers in non-usage cure periods as of a snapshot date have neither "used the service within the last 30 days" nor "cured their non-usage." Thus, the natural and best reading of section 54.407(c)(2) is that ETCs may not receive support payments for such subscribers.

Because the Snapshot Rule arguably requires what 47 C.F.R. § 54.407(c)(2) prohibits, it might be argued that the rules appear to be "genuinely ambiguous." *Kisor*, 139 S. Ct. at 2414. We are not convinced, however. In our view, and for the reasons that we set forth below, we find that the Commission's interpretation is compelled by the terms of the rules. And *Kisor* instructs that "if there is only one reasonable construction of a regulation – then a court has no business deferring to any other reading, no matter how much the agency insists it would make

more sense." 139 S. Ct. at 2415 (holding that "[i]f uncertainty does not exist, there is no plausible reason for deference"). Therefore, we need not "defer" to the Commission's judgment, as if to suggest that there are other reasonable constructions of the rules. We simply reject Petitioner's position because it rests on an untenable interpretation of the rules.

We should make it clear, however, that even if the rules are seen to be genuinely ambiguous, "the character and context of the agency interpretation entitles it to controlling weight." *Id.* at 2416 (citation omitted). The Supreme Court has cautioned that, with respect to this inquiry, our analysis cannot be "reduce[d] to any exhaustive test." *Id.* However, if we adhere to the interpretive guideposts set forth by the Supreme Court in *Kisor*, we have little trouble in concluding that we would be obliged to defer to the Commission's position in this case if the rules were genuinely ambiguous.

First, the disputed interpretation was "actually made by the agency." *Id.* Put another way, it was "the agency's 'authoritative' [and] 'official position'" on this issue and "emanate[d] from those actors, using those vehicles, understood to make authoritative policy in the relevant context." *Id.* (quoting *Mead*, 533 U.S. at 257-59, 258 n.6 (Scalia, J., dissenting)). The Commission denied the Petition in a formal Order published in the Federal Register. It cannot be doubted that this expressed an "authoritative" and "official position" on the matter in issue.

Second, the interpretation espoused in the 2019 Lifeline Order "implicate[d] [the Commission's] substantive expertise." *Id.* at 2417. The Court has explained that, under this factor, "the basis for deference ebbs when '[t]he subject matter of the [dispute is] distan[t] from the agency's ordinary' duties or 'fall[s] within the scope of another agency's authority.'" *Id.*

(alterations in original) (quoting *City of Arlington*, 569 U.S. at 309 (Breyer, J., concurring in part and concurring in the judgment)). The issue presented here involved administration of Lifeline, a complex program laden with carefully considered implicit and explicit policy judgments on the part of the Commission. *See, e.g.*, 2012 Lifeline Order at 6771 (explaining policy rationale for why only prepaid Lifeline service is subject to the non-usage rules of 47 C.F.R. § 54.407(c)); 2016 Lifeline Order at 4114-15 (explaining why the Commission decided to allow sending a text message to serve as evidence of usage and why it concurrently reduced the length of non-usage periods leading to a Lifeline subscriber's de-enrollment). And Congress has explicitly entrusted the Commission with implementation and oversight of the program. *See* 47 U.S.C. § 254(c)(1) (requiring the Commission to "establish[]" and "defin[e] . . . the services that are supported by Federal universal service support mechanisms"); *see also Mozilla Corp.*, 940 F.3d at 68 (discussing the background of, and the Commission's role in, the Lifeline program). The FCC's action in this case surely implicated its "policy expertise." *Kisor*, 139 S. Ct. at 2417.

Third, the Commission's interpretation "reflect[ed its] 'fair and considered judgment.'" *Id.* at 2417 (quoting *Christopher*, 567 U.S. at 155). Based on the record, the Commission carefully considered Petitioner's arguments – from both a policy and an interpretative standpoint – and rejected them. Furthermore, the Commission did not adopt its interpretation as merely a "'convenient litigating position' or '*post hoc* rationalizatio[n] advanced' to 'defend past agency action against attack.'" *Id.* (alteration in original) (quoting *Christopher*, 567 U.S. at 155).

It is true that under this factor, "a court may not defer to a new interpretation, whether or not introduced in litigation, that

creates 'unfair surprise' to regulated parties." *Id.* at 2417-18 (quoting *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 170 (2007)). Ultimately, that inquiry turns in large part on whether the interpretation results in a "lack of 'fair warning'" to the regulated entities. *Id.* at 2418 (quoting *Christopher*, 567 U.S. at 156). As we explain below, there was no good reason for Petitioner to have been surprised, let alone *unfairly* surprised, by the Commission's interpretation. From Petitioner's perspective, the relevant regulations were – at best – ambiguous. The Petition itself seems to acknowledge as much. *See* Petition at 2, J.A. 148 (explaining that ETCs approached the Bureau seeking to "clarify the interplay" between the regulations). And the guidance from the Administrator that had created some confusion had only been in place for little over a year and was merely "informal." *See id.* at 3, J.A. 149. To the extent these facts have any relevance under this factor, they do not undermine our view that the Commission's interpretation was a product of its fair and considered judgment.

Accordingly, we find that the character and context of the Commission's interpretation of its regulations in the 2019 Lifeline Order are sufficient for deference under *Kisor if the rules are seen to be genuinely ambiguous*. Thus, if the interpretation is "reasonable," or "within the zone of ambiguity" the language of the regulations reasonably permits, it is entitled to deference. *Id.* at 2415-16 (citation omitted). Under that standard, the Commission's interpretation easily passes muster.

When two provisions irreconcilably conflict, the specific one generally governs. *See Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692, 698 (D.C. Cir. 2014). Section 54.407(a) establishes a *general* rule: ETCs receive support payments for Lifeline subscribers "serve[d] directly as of the first of the

month." That broad language would seemingly include all prepaid Lifeline subscribers. Section 54.407(c), however, carves out *specific* exceptions applicable only to prepaid plans. Thus, the Commission's judgment that the command of the more specific provision controls was reasonable. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 646 (2012) ("It is an old and familiar rule that, where there is, in the same statute, a particular enactment, and also a general one, which, in its most comprehensive sense, would include what is embraced in the former, the particular enactment must be operative, and the general enactment must be taken to affect only such cases within its general language as are not within the provisions of the particular enactment." (quoting *United States v. Chase*, 135 U.S. 255, 260 (1890))).

Furthermore, the Commission's interpretation gives meaning to every provision in the rules: The general reimbursement rule contained in section 54.407(a) applies to fee-for-service Lifeline plans, while the specific exceptions in section 54.407(c) apply only to prepaid plans. To read the regulations otherwise would render significant portions of section 54.407(c)(2) nugatory, a result to be avoided if possible. *See Del. Dep't of Nat. Res. & Env't Control v. EPA*, 895 F.3d 90, 99 (D.C. Cir. 2018) ("[W]e strive to construe [a] statute[] 'so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.'" (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009))).

In sum, we hold that the disputed rules clearly foreclose payments to ETCs for subscribers in prepaid plans who have not used Lifeline service for 30 consecutive days or who have not cured their nonusage. We see no genuine ambiguity in the rules requiring us to apply "*Auer* deference." *Kisor*, 139 S. Ct. at 2410. Given this finding, it goes without saying that the

Commission's interpretation would easily garner deference under *Kisor* if the rules were genuinely ambiguous.

### E. The Commission's Action was not Arbitrary and Capricious

Petitioner also argues that, even if the Commission's interpretation of its rules was permissible, the denial of the Petition in the 2019 Lifeline Order was arbitrary and capricious for want of reasoned decisionmaking and lack of evidentiary support. We disagree.

*First*, we reject Petitioner's argument that the Commission's interpretation violates the purpose and design of the Snapshot Rule. We agree with Petitioner that the Snapshot Rule in 47 C.F.R. § 54.407(a) appears designed to "establish[] Provider reimbursement claim amounts," Final Br. for Pet'r at 20, but this does not carry the day. When the Commission adopted the Snapshot Rule in 2015, it left in place section 54.407(c)(2), including its treatment of prepaid Lifeline subscribers who have not used their Lifeline service for an extended period. Thus, the Snapshot Rule was cabined by other provisions in the Commission's rules that remained in place and continued to reasonably prohibit reimbursement for non-usage, cure-period Lifeline subscribers.

*Second*, Petitioner argues that the 2019 Lifeline Order runs counter to specific record evidence. According to Petitioner, the Commission ignored its contention that if ETCs "are prohibited from seeking reimbursement for providing Lifeline service to eligible subscribers in a cure period as of the snapshot date, they will have difficulty maintaining current service offerings." Final Br. for Pet'r at 25. Furthermore, Petitioner asserts that the Commission ignored Sprint's Comment "detail[ing] the significant investments [ETCs] make to provide Lifeline service to cure period subscribers."

*Id.* As a result, according to Petitioner, the 2019 Lifeline Order will lead to a "detrimental impact" on "Lifeline program availability and affordability." *Id.* at 27. Petitioner has failed to support these claims, however.

Petitioner's policy arguments should have been raised in 2012, when the Commission adopted the specific language in section 54.407(c)(2) that supports the Commission's decision here to prohibit reimbursement for non-usage, cure-period subscribers. Even if we assume that these claims can be properly reviewed now, say, because the FCC effectively reopened the matters for further consideration, we still find no merit in Petitioner and Sprint's claims. Neither Petitioner nor Sprint provided any quantitative data to back up its assertions, such as: (1) how many prepaid subscribers are in cure periods on snapshot dates? (2) how much does it cost ETCs to provide service for non-usage cure period subscribers? (3) what percentage of prepaid subscribers ultimately cure their non-usage? or (4) how much would it likely cost to update internal ETC systems to implement any necessary changes? Given the record in this case, the Commission justifiably concluded that the alleged burden imposed on ETCs under its interpretation of the rules would not be particularly onerous. *See* 2019 Lifeline Order at 10,939, J.A. 59.

*Third*, Petitioner asserts that the 2019 Lifeline Order did not properly address Smith Bagley's claim that the FCC's enforcement scheme is unreasonable because it is internally inconsistent. Final Br. for Pet'r at 28-30. Smith Bagley pointed out in its Comment that Lifeline users can be de-enrolled for several reasons, only one of which is non-usage. *See* Comments of Smith Bagley at 5, J.A. 141; 47 C.F.R. § 54.405(e)(1), (3)-(5). For example, a Lifeline subscriber may be de-enrolled if it appears the subscriber no longer qualifies as a "low-income consumer" eligible to participate in the Lifeline

program. *See* 47 C.F.R. § 54.405(e)(1). The Commission's rules create a 30-day cure period for non-eligibility, during which a subscriber is provided an opportunity to demonstrate that they remain a qualifying low-income consumer and during which – as for non-usage cure periods – an ETC must still provide Lifeline service. *See id.* However, because the strictures of section 54.407(c)(2) do not apply to de-enrollment reasons other than non-usage, the Commission's rules appear to allow ETCs to receive support payments for these subscribers in *non-eligibility* cure periods as of snapshot dates. *See id.* § 54.407(a). Given this perceived inconsistency, Smith Bagley argued that "[*t*]*he Commission's reimbursement rules* do not provide a basis for such a distinction" between non-usage cure periods and cure periods for other de-enrollment reasons. Comments of Smith Bagley at 6, J.A. 142 (emphasis added).

However, as the Commission explained, the applicable rules *do* provide a basis for such a distinction. The plain text of section 54.407(c)(2) – carving out non-usage as a specific exception to the general reimbursement rule of section 54.407(a) – provides a strong textual basis for differentiated treatment between non-usage cure periods and all other cure periods. And the Commission has explained why non-usage in the prepaid category is unique and, thus, requires unique treatment. *See* 2012 Lifeline Order at 6771. In sum, the full reach of the Commission's rationale justifying the 2012, 2015, 2016, and 2019 Lifeline Orders makes it clear that Smith Bagley's "inconsistent enforcement" argument is without merit.

*Fourth*, as suggested above, the 2019 Lifeline Order did not trample any reasonable reliance interests held by Petitioner or ETCs such that denial of the Petition was arbitrary and capricious. According to Petitioner, ETCs were misled when

they relied on the informal guidance posted on the Administrator's website. This is a specious claim. Under the Commission's rules, the "Administrator may not make policy, interpret unclear provisions of the [applicable] statute or [Commission] rules, or interpret the intent of Congress." 47 C.F.R. § 54.702(c). Indeed, the website itself provided "no assurance that the Commission ever accepted [the Administrator's 2016 approach] as correct . . . , nor even that the Commission scrutinized the details" of the issue. *See SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021, 1037 (D.C. Cir. 2017). Furthermore, the Petition itself acknowledged that the Administrator has only a "limited role," which necessitated Commission intervention following the Administrator's revision of its website. Petition at 6, J.A. 152. And the Petition noted that "the Commission previously has reversed decisions by [the Administrator] that have been rendered in the absence of a formal interpretation by the Commission of its rules." *Id.* Thus, information on the Administrator's website in 2016 "did not require the Commission to follow the same approach" when evaluating the merits of the Petition. *See SNR Wireless*, 868 F.3d at 1037.

In addition, the Petition itself effectively acknowledged that there was some confusion over how 47 C.F.R. §§ 54.405(e)(3), 54.407(a), and 54.407(c)(2) should be construed together. Indeed, this apparently explains why ETCs approached the Bureau in late 2016 seeking to "clarify the interplay" of those three rules. Petition at 2, J.A. 148. What resulted was – in the words of the Petition – "informal guidance" from the Bureau and changes to the Administrator's website. *Id.* at 3, J.A. 149. The informal guidance offered to Petitioner and ETCs certainly did not nullify the Commission's authority to officially interpret its own rules when Petitioner sought declaratory relief. *See SNR Wireless*, 868 F.3d at 1037 (noting a prior holding of this court "that the reasoning behind

unchallenged Media Bureau actions cannot be attributed to the [Commission] unless and until the [FCC] has endorsed those actions" (internal quotation marks and ellipses omitted) (quoting *Comcast Corp. v. FCC*, 526 F.3d 763, 769 (D.C. Cir. 2008))).

## F. Petitioner Has Not Established a Viable Regulatory Takings Claim

Finally, we reject Petitioner's argument that denial of the Petition violated the Takings Clause of the Constitution. The Fifth Amendment prohibits the taking of "private property . . . for public use, without just compensation." Under this clause, "whether a particular restriction will be rendered invalid by the government's failure to pay for any losses proximately caused by it depends largely" upon an ad hoc inquiry for a given case. *Penn Cent. Transp. Co. v. City of N.Y.*, 438 U.S. 104, 124 (1978) (citation omitted). However, when an owner of property voluntarily participates in a regulated market, additional regulations that "may reduce the value of the property regulated" do not result in a taking. *Bowles v. Willingham*, 321 U.S. 503, 517 (1944); *see also Garelick v. Sullivan*, 987 F.2d 913, 916 (2d Cir. 1993) ("[W]here a service provider voluntarily participates in a price-regulated program or activity, there is no legal compulsion to provide service and thus there can be no taking.").

Before this court, Petitioner argues that its members' property interests subject to a taking are "the voice/data usage allotments purchased" by wireless resellers "to provide Lifeline service to subscribers in a cure period." Final Br. for Pet'r at 51. According to Petitioner, ETCs purchase such allotments specifically to serve prepaid Lifeline subscribers in cure periods, and those allotments cannot be repurposed. *See id.* at 51-52.

On the record before the court, Petitioner has not established a Takings Clause violation. ETCs voluntarily elect to participate in the Lifeline program. Further, they are not required to offer prepaid Lifeline service. To the extent ETCs decide that there is now less value in prepaid plans than they initially perceived, they may elect to discontinue such plans or exit the Lifeline market altogether. Regardless, "[t]here is no requirement that the [allotments purchased by ETCs] be used for purposes which bring them under the" auspices of 47 C.F.R. § 54.407(c)(2). *See Bowles*, 321 U.S. at 517. Thus, Petitioner has not established a Takings Clause violation. *See Garelick*, 987 F.2d at 916-17.

### III. CONCLUSION

For the reasons set forth above, we dismiss the Petition for Review as to Petitioner's statutory argument and deny all other claims.